86 P.3d 1234 (2004)
Michael PETCU, individually and as the guardian of A.E.P. and W.M.P., Appellant,
v.
STATE of Washington; Child Protective Services; Department of Social and Health Services; Kyle Smith and John Doe Smith, wife and husband and the marital Community Comprised thereof, Respondents.
No. 29415-0-II.
Court of Appeals of Washington, Division 2.
March 30, 2004.
*1237 Phillip C. Raymond, Jessica B Jensen, Seattle, WA, for Appellant.
*1238 Rene David Tomisser, Atty Gen Ofc/Tort Claims, Olympia, WA, for Respondents. *1235
*1236 HOUGHTON, J.
Michael Petcu appeals from a summary judgment order dismissing his claims arising from the removal of his children from his care. We affirm.

FACTS
Petcu is the biological father of two girls, A.E.P., born on November 22, 1987, and W.M.P., born on February 6, 1990. Petcu and his wife, Elizabeth, separated in 1991 and Petcu kept custody of the children. The children also spent time with child care providers.
For the first year and one-half following the Petcus' separation, Alice Eccelston and her husband provided day care for the children. The Eccelstons did not observe any sexualized behavior by the girls.
Deanne and Dan Montgomery provided childcare to A.E.P. and W.M.P. for the subsequent six-month period, up to the time the Department of Social and Health Services filed a dependency petition on April 15, 1993. The Montgomerys have four children of their own. The Petcu girls typically spent ten hours each day, five or six days per week, at the Montgomery home.
Deanne observed numerous instances of sexualized behavior involving the girls. The incidents started about a week after the girls began staying with the Montgomerys. Deanne saw A.E.P. touching W.M.P.'s vaginal area while the girls bathed together. She saw A.E.P. attempting to insert a small toy into W.M.P.'s vagina. She saw A.E.P. rubbing herself in the vaginal area. On other occasions, she saw A.E.P. trying to pull W.M.P.'s pants down and placing her hand down the front of W.M.P.'s pants. One day, Deanne found her seven-year-old son, C.M., and A.E.P. together under a blanket. C.M. was tickling A.E.P.'s vaginal area.
Both Dan Montgomery and Shawn Murphy, a friend of the family who often visited the Montgomery home, observed similar instances of sexualized touching between the girls. The Montgomerys reported the sexualized behavior to Petcu in early March 1993.
Based on their observations, Deanne, Dan, and Murphy suspected that the children had been sexually abused. Deanne, herself a victim of sexual abuse as a child, questioned A.E.P. on numerous occasions regarding whether someone had touched her inappropriately. A.E.P. denied that any inappropriate touching occurred.
On April 13, 1993, Deanne heard screaming and found the girls together in a bedroom. She saw A.E.P. pinning W.M.P. to the floor, with her hand over W.M.P.'s vaginal area. W.M.P. was crying and fighting to get away. Deanne and Murphy separated the girls and punished A.E.P. by making her stand in a corner.
Deanne called Petcu at work but could not reach him. Then Deanne and Murphy questioned A.E.P. for 45-90 minutes, trying to discover where she learned the behavior. Initially, A.E.P. was upset, crying, and reluctant to speak. Deanne comforted her and she calmed down. Following a series of leading questions by Deanne and Murphy, A.E.P. said that her mother and father had touched her inappropriately.
After Dan arrived home from work, he questioned A.E.P. for about an hour. A.E.P. again stated that her father touched her inappropriately.
When Petcu arrived to pick up the girls later that night, the Montgomerys confronted him with A.E.P.'s disclosures. Petcu took the children home. Deanne called Child Protective Services (CPS) to report the alleged abuse. A police officer interviewed Deanne and prepared a police report. CPS caseworker Kyle Smith received the report the next day.
On April 14, Smith interviewed Deanne. In addition to describing the events set forth above, Deanne told Smith that W.M.P. had frequent yeast infections and that both girls had "leathery" vaginal areas. 3 Clerk's Papers (CP) at 490.
Smith then spoke with Chief Jerry Patterson of the Mason County Sheriff's Department. Patterson told her that he had reviewed the police report and believed that *1239 the girls should be taken into protective custody. Smith arranged a foster care placement for the girls.
The same day, Smith spoke with Elizabeth Petcu, the girls' mother. Elizabeth said she saw the girls every six or eight weeks and had never seen signs of sexual abuse. She said that she was sexually abused by her mother when she was a child. She also said that she left Petcu because he physically abused her and threatened her with a hunting knife and that she had secured a protective order after the incident.
Later that day Smith, accompanied by a deputy sheriff, took the girls into protective custody. First they picked up W.M.P., who was with Deanne. Then they went to the residence of Petcu's friend and neighbor, Lori Blackwell, to pick up A.E.P. A.E.P. was upset and did not want to go with Smith and the deputy. After talking with her for awhile to try to make her feel more comfortable, Smith took A.E.P. out to the patrol car. A.E.P. was crying. Smith placed A.E.P. on her lap and tried to comfort her.
On the way to the foster home, the deputy stopped at the police substation to use the restroom. Petcu drove up while they were there, and Smith took A.E.P. to the back of the station, out of his view. But A.E.P. saw her father and was upset that she could not go to him. While waiting for the deputy to return, Smith began talking with A.E.P., asking her about whether she had been inappropriately touched. A.E.P.'s initial response to Smith's questions indicated that she may not have understood the difference between truth and falsity. Smith stopped questioning A.E.P. because she did not have any of her interviewing tools with her.
About 8:30 P.M. and after Petcu left the police substation, Smith took A.E.P. to Detective Brian Kelly's office. A.E.P. was hungry, so Smith bought her dinner.
While A.E.P. ate, Smith showed her a body map and they discussed "bad touching." 3 CP at 494. A.E.P. disclosed that C.M. (age 7) and K.B. (age 4) had inappropriately touched her. When Smith asked if anyone "bigger" had touched her, A.E.P. became teary-eyed and said, "My dad said if I told I'd get in trouble." 3 CP at 494. Smith assured her that she would not get in trouble and that it was important to talk about it so they could get the touching to stop.
A.E.P. then said that her father touched her "privates" and asked her to touch his "butt," but she had refused. 3 CP at 495. She said that while he was touching her "privates" he was "wiggling his private" with his hand. 3 CP at 495. She pointed to the penis on a diagram of the adult male as she described this behavior. She also said, "my dad sticks his tongue in my mouth and I don't like it." 3 CP at 495.
Smith asked A.E.P. whether her mother had inappropriately touched her. A.E.P. said "no" and Smith did not inquire further. 2 CP at 236. Because A.E.P. was tired, the interview ended around 9:30 P.M. Smith took A.E.P. to Judy Brewer's foster home, where W.M.P had already been taken. The girls stayed with Brewer for the next six weeks.
On April 15, Smith interviewed Petcu in the presence of his attorney. Dan Montgomery and the Blackwells also accompanied Petcu to the interview. Petcu said that after the Montgomerys told him about the sexualized behavior, he explained to A.E.P. that "it wasn't good for [W.M.P.] or her" to do that. 3 CP at 496. After the incident between C.M. and A.E.P., both Dan and Petcu had scolded the children.
Smith denied Petcu's request for visitation. Petcu's attorney asked Smith to schedule a shelter care hearing as soon as possible.[1]
After Petcu left the room, Smith continued speaking with Dan. In the meantime, Elizabeth Petcu arrived. An office intern alerted Smith that Petcu was "badgering" Elizabeth in the waiting room. 3 CP at 497. Later, Elizabeth told Smith that Petcu and the Blackwells urged her to help "get their stories straight" so they could get the children back. 3 CP at 497.
*1240 On April 15, Smith prepared a dependency petition. That day, she also spoke with Dr. Lein-chun Shaw, the children's pediatrician. Dr. Shaw told Smith that she was not qualified to do a sexual abuse examination.
On April 16, Dr. Victor Cillis examined A.E.P. and W.M.P. W.M.P. did not provide helpful information to Dr. Cillis as to whether she had been sexually abused. W.M.P.'s physical examination revealed an abnormally large hymenal opening, but no evidence of penile penetration. The findings were consistent with digital penetration and fondling.
After examining W.M.P., Dr. Cillis spoke with A.E.P. for approximately one-half hour. In response to questioning, A.E.P. said that neither her father nor anyone else had touched her inappropriately. The doctor's physical examination revealed mild, nonspecific redness of A.E.P.'s vaginal area.
A shelter care hearing was held on April 16, 1993, and DSHS also filed an amended dependency petition that day.
On April 22, Detective Kelly interviewed A.E.P., with Smith present. A.E.P. had difficulty understanding the difference between truth and lies but she had a better understanding of the difference between real and unreal.
In response to questioning, A.E.P. initially told the detective that no one ever touched her inappropriately. After the detective showed her a body map and asked her again if anyone had touched her private parts, A.E.P. said that C.M. did and pointed to the buttocks area. When asked whether her father touched her anywhere she didn't like, she nodded affirmatively and pointed again to the buttocks area. But she said that no one had touched her "pee pee." 2 CP at 365. Smith observed that A.E.P. was very uncomfortable with the conversation. A.E.P. was reluctant to speak with the detective. She kept glancing over to Smith. Smith reassured her that it was okay to speak with the detective, that he wanted to help her, and that she would not get in trouble for talking with him.
The detective asked her again if anyone touched her private parts and she said her father did. The detective asked her to show him where, on the map, and she pointed to the vagina. She said that while she and her father sat together, watching television, her father touched her underneath her clothes while "wiggling his private." 3 CP at 366. He asked her whether her father's penis was big or small and she spread her hands out about 10 inches. She said it was hard.
Smith asked her to draw a picture of what her dad's "privates" looked like and she drew it horizontally, as though he had an erection. The detective gave her a marker and asked her to show him how the "wiggling" occurred. She held the end of the marker and moved it in a circular motion. The detective asked her how he touched her and she held up an index finger and said that he put his finger inside her and poked her hard. She said when he did that, it hurt "like an owie." 3 CP at 500.
When the detective asked her whether her father said anything after he touched her, she said, "No." 3 CP at 500. Smith asked A.E.P. to remember what she had told her in her office and again reassured her that it was okay to tell the detective. A.E.P. said that her father told her not to tell anyone and that she would get a spanking and have to stand in a corner if she did. She said that her father told her that "all the time." 1 CP at 103.
A.E.P. said that her father put her hand on his penis but she pulled away. He also tried to get into bed with her but she resisted and he went away.
The detective asked her whether she told Dr. Cillis about this. A.E.P. said that she had not because she did not think that he would believe her. The detective asked her if what she said about her father touching her inappropriately was real or pretend, A.E.P. said it really happened. Smith asked her if what she told her about her dad sticking her tongue in her mouth had really happened. A.E.P. shook her head yes. 2 CP at 367.
On April 23, Smith spoke with Dr. Cillis. She told him about A.E.P.'s disclosures. Dr. Cillis agreed that the marks on W.M.P. could have been caused by something other than A.E.P.'s digital penetration.
*1241 On April 26, Detective Kelly interviewed Dr. Shaw and obtained copies of the girls' medical records. Dr. Shaw said that she had treated W.M.P. for an antibiotic-based yeast infection. Dr. Shaw also related that Petcu was a good father and that the children exhibited no signs of sexual abuse.
On May 4, Smith spoke with the girls' foster mother. A.E.P. then talked with her and said, "I have to tell you something, I didn't touch my sister." 3 CP at 503.
On May 24, Petcu's attorney told Smith that during a deposition, Deanne admitted questioning A.E.P. 12-15 times about whether she had been inappropriately touched.
On May 25, Petcu's attorney told Smith that his investigations revealed that C.M. had engaged in a pattern of inappropriate touching with other school children. He urged her to investigate C.M. as an alternate possible perpetrator.
Elizabeth Petcu requested that Smith place the children with her in Portland. Pursuant to an interstate compact, Smith obtained the results of a home study which indicated that Elizabeth could provide a satisfactory home, albeit barely within minimal standards. Smith also obtained a satisfactory report from Elizabeth's therapist. Smith recommended that the dependency court place the girls with Elizabeth. On May 25, the dependency court did so.
On June 23, Dr. Cillis examined A.E.P. a second time. During the interview, A.E.P. disclosed that C.M. had inappropriately touched her. In response to questioning, she also told him that she had seen her father "[w]iggling his privates." 1 CP at 78. She said that he did it while watching television, did not say anything, and was not near A.E.P. A.E.P. said she was sitting on a stool at the time, watching television. A physical examination revealed a slight notch in A.E.P.'s hymen.
A.E.P. became upset after the second doctor's visit and told her foster mother that she did not like being touched by the doctor. Then without prompting, A.E.P. said that C.M. touched her private area on a few occasions but no one else touched her. A.E.P. made spontaneous statements to Brewer on two other occasions. She remarked that a balloon tip looked like a penis. She also said that when she sits on her father's lap, "he hurts my privates real bad and makes it red." 1 CP at 63.
Petcu denied any inappropriate touching and sought independent verification. He hired a polygraph expert. The results indicated that Petcu spoke truthfully when he denied touching his children for other than hygienic purposes. Petcu provided Smith with the polygraph results on May 21, 1993. Petcu also hired two private licensed psychologists, Dr. Richard Peterson and Dr. Stuart Greenberg, to perform a sexual deviancy evaluation.
Drs. Peterson and Greenberg relied on documentary evidence given to them by Petcu's attorney. They also conducted interviews and performed psychological testing. The documentary evidence included, among other things, a copy of Detective Kelly's investigative report detailing his interview with Dr. Shaw, as well as the girls' medical records.
As a result of his evaluation, Dr. Peterson concluded that Petcu was not sexually deviant, had a low to nonexistent risk of offending, and was probably not the perpetrator of any sexual abuse A.E.P. may have suffered. Petcu provided Smith with a copy of Dr. Peterson's report, dated July 20, 1993.
On July 12, Dr. Greenberg spent one hour with both girls. He spent an additional hour with the girls and their mother. On July 21, Dr. Greenberg spent one hour with the girls and Smith, then 30 minutes with Petcu and the girls. As a result of his interviews, Dr. Greenberg concluded that A.E.P. could not reliably describe the alleged sexual abuse incidents.
Dr. Greenberg also reviewed the results of the polygraph and other reports related to the investigation. As a result of his evaluation, the doctor concluded that it was unlikely that Petcu was the perpetrator of the alleged sexual abuse. Petcu provided Smith with the results of Dr. Greenberg's report, dated July 26, 1993.
Judge Toni Sheldon presided over the dependency proceedings, from the initial shelter *1242 care hearing on April 16, through the fact finding trial held in August 1993. Petcu's main focus throughout the proceedings was to challenge the credibility of A.E.P.'s disclosures, arguing that they were the tainted product of Deanne's and Smith's improper interview techniques.
At the dependency hearing, Dr. Greenberg testified that during his first interview with A.E.P., she complained a lot about Smith. A.E.P. told him that Smith made her say things that she didn't want to say. She said, "My daddy did not touch me, I tried to explain to Kyle [Smith] but she was working all day." 2 CP at 238. During the second interview, with Smith present, A.E.P. told Smith that her father did not touch her. She said that only C.M. touched her. Smith reminded A.E.P. of what she previously disclosed about her father's inappropriate touching. A.E.P. became upset, looked Smith in the eye, and said, "I'm telling the truth!" 1 CP at 145.
Dr. Greenberg testified in depth regarding proper interviewing techniques. He said that 80 percent of studies show that children between the ages of three and five are at the height of suggestibility. He said that the first interview is the most important because it tends to cement the child's memory. If the interview is conducted improperly, it may result in false memories.
Judge Sheldon permitted A.E.P. to testify at the dependency hearing after questioning her and finding her competent. A.E.P. testified that C.M. had touched her, that her father touched her "pee pee" underneath her clothes, and that she saw her father wiggling his penis.
After taking the testimony of all the witnesses, Judge Sheldon admitted all of A.E.P.'s hearsay statements. She found that "[A.E.P.'s] inconsistent statements and retractions of disclosures do not significantly diminish the weight given [A.E.P.'s] disclosures of inappropriate sexual touching by her father." 1 CP at 80. She also found that "[A.E.P.'s] disclosures of touching by [C.M. and K.B.] do not diminish the weight given [A.E.P.'s] disclosures of inappropriate sexual touching by her father." 1 CP at 80. Judge Sheldon concluded that, based on a preponderance of the evidence, Petcu sexually abused the children. She ordered the children dependent.
The dependency order required that Petcu submit to a sexual deviancy evaluation. Petcu complied and took a second polygraph test and a plethysmograph[2] test. The results were favorable to Petcu.
Judge Sheldon also presided over the Petcus' separate dissolution proceedings. She incorporated her dependency finding of sexual abuse into the parenting plan and awarded custody to Elizabeth Petcu. The dependency proceedings were then dismissed.
Petcu appealed the dependency court findings. Our court affirmed the trial court. But our Supreme Court granted review and overturned the dependency findings in May 1998. In the Matter of the Dependency of A.E.P. and W.M.P., 135 Wash.2d 208, 956 P.2d 297 (1998). The Court held that the trial court erred in admitting A.E.P.'s hearsay statements because she was not competent to testify and her statements were not corroborated as required by RCW 9A.44.120. A.E.P. and W.M.P., 135 Wash.2d at 234, 956 P.2d 297. Petcu regained custody of his children following the Court's opinion.
In October 2000, Petcu filed a civil suit, individually and as A.E.P.'s and W.M.P.'s guardian, against the State of Washington, CPS, Department of Social and Health Services, Kyle Smith and John Doe Smith (referred to hereafter collectively as DSHS), claiming negligent investigation, negligent placement, and violation of his civil rights under 42 U.S.C. § 1983.
DSHS moved for summary judgment, arguing that the negligence claims should be dismissed under Tyner because Petcu failed to present competent evidence that the dependency court had been deprived of material information as a result of a negligent investigation. Tyner v. Dep't of Social & *1243 Health Servs., 141 Wash.2d 68, 1 P.3d 1148 (2000). DSHS also argued that the statute of limitations barred Petcu's claims. Finally, DSHS argued that the 42 U.S.C. § 1983 claims should be dismissed because Smith was entitled to qualified immunity.
Petcu responded, arguing that genuine material questions of fact existed as to whether Smith's biased and incomplete investigation was the proximate cause of Judge Sheldon's dependency order. He also argued that the statute of limitations tolled from the time the dependency orders were entered until the Supreme Court overturned them. Finally, he argued that Smith was not entitled to qualified immunity because she violated Petcu's clearly established right to family unity.
In opposition to the summary judgment motion, Petcu presented an affidavit by Dr. Shaw, the girls' physician. Dr. Shaw stated that she had known the girls since they were born. Petcu brought them in regularly for immunizations, routine checkups, and medical treatment for ear infections. Dr. Shaw thought that Petcu was a "nice father." 3 CP at 555. Dr. Shaw stated that no one from CPS ever contacted her regarding A.E.P. and W.M.P.[3]
Petcu also presented an affidavit by Jane Ramon, an expert in CPS investigations. Based on her review of documentary evidence, Ramon concluded that Smith's investigation fell below a reasonable standard of care for CPS caseworkers. She specifically found fault with Smith's interviewing techniques, her failure to interview collateral witnesses such as the Eccelstons and Dr. Shaw, and her failure to further investigate whether C.M. was the perpetrator.
According to Ramon, CPS policy provides that a caseworker "shall interview, in person or by telephone, professionals and other persons (physician, nurse, school personnel, day care, relatives, etc.) who are reported to have or, the social worker believes may have first-hand knowledge of the incident, the injury, or the family's circumstances." 3 CP at 422.
Ramon also faulted Smith for not considering the impact of Deanne's 12-15 prior "interviews" of A.E.P. and for not conducting a more critical evaluation of the conditions within the Montgomery home. She further faulted Smith for failing to complete a risk assessment. She stated that Smith was not adequately supervised. In sum, Ramon believed that Smith failed to conduct the complete and unbiased investigation the CPS policy required. Ramon opined that the judge's dependency order was a direct result of the faulty investigation, noting that "[t]he testimony and recommendations provided by the social workers carry a great deal of weight with the judge, certainly more so than the testimony of the accused parent." 2 CP at 293.
During a pre-summary judgment discovery deposition, DSHS had asked Ramon, "In reviewing the material that you have and what transpired in this case, were you able to identify any specific fact that was known only to Kyle Smith in this case and not known or available to anyone else that was exculpatory for Mr. Petcu?" Ramon replied, "No." 1 CP at 185. DSHS presented this deposition testimony in support of its summary judgment motion.
Also in support of its summary judgment motion, DSHS submitted an affidavit by Charles Silverman, the deputy prosecutor who represented DSHS during the dependency hearing. He stated that he was aware that Petcu sought further investigation into C.M. as a possible perpetrator but he viewed this as attempted "misdirection" of the investigation. 1 CP at 188. In his view, Smith acted appropriately by not pursuing the theory because sex play among children could not explain A.E.P.'s description of watching her father masturbate while fondling her. Silverman stated that "[a]fter considering all the evidence, I concluded that the weight of [A.E.P.'s] disclosures and actions were not diminished significantly by the evidence on which Mr. Petcu's attorney focused." 1 CP at 189.
*1244 DSHS submitted Smith's declaration. Smith stated that although she knew that C.M. and K.B. inappropriately touched A.E.P., she did not believe this accounted for A.E.P.'s description of seeing her father masturbating his erect penis while he fondled her. She admitted that she did not fill out a risk assessment form, as required by policy. But she stated that had she filled the form out, it would have been consistent with her other records and the testimony she provided at trial. She stated:
I considered all of the evidence I gathered throughout the dependency, including the evidence and arguments presented to me by [Petcu's attorney]. For example, [Petcu's attorney] presented me with a number of character reference letters written on behalf of Mr. Petcu. I read and considered each one of these. However, as is commonly the case with such letters, none of the individuals indicated any basis for having first hand information as to whether Mr. Petcu had molested [A.E.P.].
I also considered the evidence which [Petcu's attorney] considered exculpatory such as the polygraph, reports of various experts, and the inconsistencies in [A.E.P.'s] statements. Contrary to the plaintiffs' assertion that "I did not consider" this evidence, more accurately I was not persuaded that the evidence eliminated the risk to the children. I did not assess the evidence the way [Petcu's attorney] wanted me to.
1 CP at 87. In granting DSHS's summary judgment motion, the trial court noted that: (1) the court order on the underlying dependency matter constituted a superceding intervening cause that cut off DSHS's liability for negligence; (2) qualified immunity shielded Smith from Petcu's 42 U.S.C. § 1983 claim; and (3) the statute of limitations barred Petcu's claims. Petcu appeals.

ANALYSIS

Negligent Investigation
Petcu first contends that the trial court erred in granting summary judgment. He asserts that the trial court improperly invaded the province of the jury when it ruled that Judge Sheldon's dependency order was a superceding intervening cause that cut off DSHS's liability as a matter of law.
When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. M.W. v. Dep't of Social & Health Servs., 149 Wash.2d 589, 595, 70 P.3d 954 (2003). Summary judgment is proper if the pleadings, affidavits, depositions, and admissions in the record demonstrate the absence of any genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. Wood v. Battle Ground Sch. Dist., 107 Wash. App. 550, 557, 27 P.3d 1208 (2001).
"The nonmoving party may not rely on speculation, argumentative assertions that unresolved factual issues remain." Retired Pub. Employees Council v. Charles, 148 Wash.2d 602, 612, 62 P.3d 470 (2003). After the moving party has submitted adequate affidavits, the burden shifts to the nonmoving party to set forth specific facts sufficiently rebutting the moving party's contentions and disclosing the existence of a material issue of fact. Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wash.2d 1, 721 P.2d 1 (1986). We affirm summary judgment only if, from all the evidence, reasonable persons could reach but one conclusion. Wood, 107 Wash. App. at 558, 27 P.3d 1208.
A claim for negligent investigation is available to a parent or child when the state conducts a biased or incomplete investigation that results in a harmful placement decision. M.W., 149 Wash.2d at 591, 595, 70 P.3d 954. To prevail, the claimant must prove that the allegedly faulty investigation was the proximate cause of the harmful placement. See M.W., 149 Wash.2d at 597, 601, 70 P.3d 954.
Proximate cause includes two elements: cause in fact and legal cause. Cause in fact is a jury question, established by showing that "but for" the defendant's actions, the claimant would not have been injured. Tyner, 141 Wash.2d at 82, 1 P.3d 1148. Legal cause involves the determination, in view of "`logic, common sense, justice, *1245 policy, and precedent,'" of the extent to which a defendant should remain legally responsible for the harmful consequences of his acts. Minahan v. West. Wash. Fair Assoc., 117 Wash.App. 881, 888, 73 P.3d 1019 (2003) (quoting Schooley v. Pinch's Deli Market, Inc., 134 Wash.2d 468, 478, 951 P.2d 749 (1998)). Legal cause generally is a question for the court. Minahan, 117 Wash.App. at 888, 73 P.3d 1019.
In a lawsuit based on negligent investigation, a caseworker may be legally responsible for a parent's separation from a child, even when the separation is imposed by court order, but only if the court has been deprived of a material fact due to the caseworker's faulty investigation. Tyner, 141 Wash.2d at 86, 1 P.3d 1148. Otherwise, court intervention operates as a superseding intervening cause that cuts off the caseworker's liability. Tyner, 141 Wash.2d at 88, 1 P.3d 1148.
A material fact is one that would have changed the outcome of the court's decision. Tyner v. Dep't of Social & Health Servs., 92 Wash.App. 504, 518, 963 P.2d 215 (1998), rev'd on other grounds, 141 Wash.2d 68, 1 P.3d 1148 (2000). The question of materiality goes to the issue of cause in fact and is therefore a question for the jury unless reasonable minds could reach but one conclusion. Estate of Jones v. State, 107 Wash.App. 510, 517-18, 15 P.3d 180 (2000), review denied, 145 Wash.2d 1025, 41 P.3d 484 (2002).
The Tyner case illustrates the relationship between superceding intervening cause and negligent investigation claims. In Tyner, a father, who was subject to no-contact orders throughout dependency proceedings, sued DSHS for negligent investigation after it initiated the proceedings in response to allegations that he sexually abused his children. 141 Wash.2d at 76, 1 P.3d 1148. DSHS failed to inform the court or any of the parties that a caseworker who investigated the allegations concluded that they were unfounded. Tyner, 141 Wash.2d at 87, 1 P.3d 1148. Also in violation of standard policy, the caseworker failed to interview others who would have provided exculpatory information. Tyner, 141 Wash.2d at 87, 1 P.3d 1148. A jury returned a verdict in favor of Tyner but the appeals court overturned the verdict on the grounds that the information withheld from the court was not material and thus could not be the proximate cause of the no-contact order. Tyner, 141 Wash.2d at 71, 1 P.3d 1148. Our Supreme Court reversed, holding that a jury could have reasonably found that the withheld information was material to the court's decision and thus was the cause in fact of Tyner's separation from his children. Tyner, 141 Wash.2d at 89, 1 P.3d 1148.
In reversing, the Tyner court referred to Bishop v. Miche, 137 Wash.2d 518, 973 P.2d 465 (1999), while noting the principal importance of a trial court's awareness of material information. Tyner, 141 Wash.2d at 85, 1 P.3d 1148. Bishop involved a negligence claim by the parents of a child killed in an automobile accident caused by a probationer. 137 Wash.2d at 523, 973 P.2d 465. The probationer had committed multiple probation violations. Bishop, 137 Wash.2d at 522, 973 P.2d 465. Two days before the accident, his probation officer presented the district court with information detailing the probationer's violations, but the court refused to revoke his probation. Bishop, 137 Wash.2d at 523, 973 P.2d 465. The parents sued, alleging negligent supervision. Bishop, 137 Wash.2d at 523, 973 P.2d 465. The trial court granted summary judgment dismissing the parent's claims. Bishop, 137 Wash.2d at 523, 973 P.2d 465. In affirming the trial court, our Supreme Court stated:
So far as whether fact questions remain as to breach and proximate causation, there may be fact questions as to whether Mendenhall's supervision of Miche was negligent prior to the November 6, 1992 review hearing. However, in light of the information before the district court judge at that hearing and his decision not to revoke probation, as a matter of law proximate causation is lacking. The judge knew that Miche had violated the court-imposed condition of his probation by driving while his license was suspended. He knew that Miche had an alcohol problem but attended meetings somewhat sporadically. He knew that Miche was scheduled *1246 to attend intensive alcohol treatment within three days, and thus knew that Miche was not then in such treatment and that Miche needed such treatment. Nevertheless, despite Miche's violation of his probation conditions, the obvious severity of his alcohol problem, and the fact that Miche knowingly drove after his license had been suspended, the judge did not revoke probation. The accident occurred only two days later, one day before Miche's scheduled treatment was to begin.
As a matter of law, the judge's decision not to revoke probation under these circumstances broke any causal connection between any negligence and the accident.
Bishop, 137 Wash.2d at 531-32, 973 P.2d 465.
Thus, whether a court action precludes the existence of proximate cause may be decided as a matter of law when the court is aware of all material information and reasonable minds could not differ on the issue. Tyner, 141 Wash.2d at 86, 88, 1 P.3d 1148.
Petcu suggests that for purposes of determining whether the court has been presented with all material information, we should consider only that information presented by DSHS, not by him. We disagree because to do so would presuppose a much broader cause of action for negligent investigation than has been recognized by our courts.
There is no general cause of action for negligent investigation. M.W., 149 Wash.2d at 595, 601, 70 P.3d 954. A cause of action against the state for negligent investigation is a narrow exception that arises from the state's statutory duty under RCW 26.44.050 to investigate allegations of child abuse.[4]M.W., 149 Wash.2d at 595, 601, 70 P.3d 954. A cause of action arises when the state conducts an incomplete or biased investigation that results in a harmful placement decision, such as wrongfully removing a child from a non-abusive home, placing a child into an abusive home, or allowing a child to remain in an abusive home. M.W., 149 Wash.2d at 597-98, 70 P.3d 954. But our Supreme Court has rejected the proposition that an actionable breach of duty occurs every time the state conducts an investigation that falls below a reasonable standard of care by, for example, failing to follow proper investigative procedures. M.W., 149 Wash.2d at 601-02, 70 P.3d 954.
Thus, it would be improper for us to solely consider whether the information produced by DSHS's investigation was biased or incomplete in determining whether Petcu has alleged sufficient facts to support an actionable breach of duty. At most, an evaluation of the information produced by DSHS would reveal whether DSHS breached a general duty of care to conduct a non-negligent investigation.
However, in evaluating whether an alleged breach of duty was a cause in fact of Petcu's court-ordered separation from his children, we examine all of the information before the trial court to determine whether, but for the faulty investigation, the court would not have decided as it did. Tyner, 141 Wash.2d at 88, 1 P.3d 1148 (if a judge is given all material information and reasonable minds could not differ, the court order will be a superceding intervening cause of the complaint of action).[5]
Here, Petcu fails to identify material information that was not before the dependency court. Because, as noted below, he cannot show that the dependency court lacked material information, the trial court properly ruled that Judge Sheldon's dependency findings operated as a superseding intervening cause.
Petcu identifies flaws in Smith's investigation, including her improper interviewing techniques; her failure to interview collateral witnesses as CPS policy required; and her *1247 failure to provide the court with information that tended to exculpate Petcu, such as the favorable results of a sexual deviancy evaluation and a polygraph examination. But this information was presented to the trial court during the dependency proceedings, the record for which approaches 1,500 pages. A.E.P. and W.M.P., 135 Wash.2d at 211-12, 956 P.2d 297.
Petcu's main focus during the dependency hearing was to attack the adequacy of Smith's investigation. He presented evidence of possible abuse perpetrators. He vigorously attacked Smith's, the detective's, and the Montgomerys' interview techniques, calling into doubt the reliability of A.E.P.'s disclosures. He presented testimony from former baby-sitters and friends who testified that he was a good father who would not abuse his children. He presented two witnesses who testified that C.M. inappropriately touched other children on the school bus. He also presented Dr. Greenberg's testimony that A.E.P. was not capable of distinguishing truth and falsity and that her disclosures were probably the result of improper interviewing techniques. Additionally, Judge Sheldon had detailed knowledge of all interviews and examinations of A.E.P, as revealed in her 33-page findings of fact and conclusions of law related to the admissibility of A.E.P.'s hearsay statements.
Petcu also claims that Smith's failure to interview Dr. Shaw deprived the court of material information. But contrary to Dr. Shaw's affidavit, Smith's service record indicates that she contacted the doctor the day after the children were taken into custody. Further, Detective Kelly interviewed Dr. Shaw and obtained the children's medical reports, which he appended to his investigative report. Detective Kelly reported that according to Dr. Shaw, Petcu was a good father who always brought his children in for immunizations. Detective Kelly further reported that Dr. Shaw never observed signs that A.E.P. or W.M.P. had been sexually abused. This information was made available to Petcu. Petcu's expert witnesses, Drs. Peterson and Greenberg, both relied, in part, upon the medical records and Detective Kelly's interview notes. Petcu also had the opportunity to cross-examine Detective Kelly at trial. In view of the detailed information collected by the detective and made available to Petcu, reasonable minds could not conclude that Smith's failure to interview Dr. Shaw deprived the court of material information.
Thus, we agree with the trial court that "all material information bearing on the trustworthiness, credibility and reliability of [A.E.P.'s] claims was known by Judge Sheldon at the time she made her determination."[6] Report of Proceedings (Court's Ruling) at 12. Notwithstanding this information, Judge Sheldon found that Petcu had sexually abused A.E.P. and ordered the children dependent. Because reasonable minds could not differ as to whether Judge Sheldon had all material information before her, her decision, as a matter of law, broke any causal connection between any state negligence and Petcu's separation from his children.
The trial court did not err in granting summary judgment on Petcu's negligent investigation claims.

42 U.S.C. § 1983 Civil Rights claim
Petcu next contends that the trial court erred in ruling that qualified immunity shielded Smith from his 42 U.S.C. § 1983 civil rights claim.
Under the doctrine of qualified immunity, DSHS officials cannot be held personally liable for damages in a 42 U.S.C. § 1983 action unless their conduct violated a clearly established constitutional right. Robinson v. City of Seattle, 119 Wash.2d 34, 64-65, 830 P.2d 318, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992). The question whether qualified immunity shields a defendant from liability is an issue of law for the court. Aitken v. Reed, 89 Wash.App. 474, 486, 949 P.2d 441, review denied, 136 Wash.2d 1004, 966 P.2d 901 (1998); see also *1248 Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (reversing trial court's decision to permit a jury to decide the factual underpinning of qualified immunity because immunity issues should be resolved, as a matter of law, at the earliest possible stage in litigation). Once a defendant asserts a defense of qualified immunity, the plaintiff must show that a clearly established constitutional right exists. Robinson, 119 Wash.2d at 65-66, 830 P.2d 318.
As a threshold matter, a court required to rule on the issue of qualified immunity must first consider whether, taken in the light most favorable to the plaintiff, the facts alleged constitute a violation of a claimant's constitutional right. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. If not, the inquiry ends. Saucier, 533 U.S. at 201, 121 S.Ct. 2151. If so, the next step is to determine whether the constitutional right was clearly established at the time of the alleged violation. Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
To be clearly established, the contours of the constitutional right must have been defined with sufficient clarity and specificity, through decisional law or statute, so that a reasonable official would have known that his or her conduct violated a constitutional right. Saucier, 533 U.S. at 202, 121 S.Ct. 2151; Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To determine a clear right, a court should "survey the legal landscape" at the time of the alleged violation to determine whether a constitutional right is clearly established. Trevino v. Gates, 99 F.3d 911, 917 (9th Cir.1996); see also Figueroa v. United States, 7 F.3d 1405, 1409 (9th Cir.1993).
Petcu argues that Smith's flawed investigation deprived him of a constitutional liberty interest in family unity. The Supreme Court has recognized an abstract fundamental liberty interest in family integrity. Lehr v. Robertson, 463 U.S. 248, 258, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Santosky v. Kramer, 455 U.S. 745, 748, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (the State cannot permanently sever the parent-child bond without providing fundamentally fair procedures). A parent may not be deprived of the companionship of his child without due process of the law. Santosky, 455 U.S. at 747-48, 102 S.Ct. 1388. But this is a "general proposition" that does not meet the specificity required to show that a constitutional right is clearly established. Saucier, 533 U.S. at 202, 121 S.Ct. 2151.
Petcu cites several inapposite cases in support of his 42 U.S.C. § 1983 claim. We address each in turn. In Babcock v. Dep't of Social & Health Servs., 116 Wash.2d 596, 618, 809 P.2d 143 (1991), our Supreme Court held that caseworkers are entitled to qualified immunity from liability for negligence related to their investigation of child abuse allegations only when they act reasonably in carrying out a statutory duty according to procedures dictated by statute and superiors. But Babcock concerns qualified immunity from liability for common law negligence, not for federal civil rights violations. 116 Wash.2d at 619-20, 809 P.2d 143. As the Babcock court recognized, "the scope of immunities under 42 U.S.C. § 1983 does not determine the scope of immunities from state tort claims." 116 Wash.2d at 617 n. 12, 809 P.2d 143. Federal law defines the scope of qualified immunity from 42 U.S.C. § 1983 claims. Martinez v. California, 444 U.S. 277, 284 n. 8, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980).
In Waller v. Dep't of Social & Health Servs., 64 Wash.App. 318, 824 P.2d 1225, review denied, 119 Wash.2d 1014, 833 P.2d 1390 (1992), Division One reversed a trial court's ruling that qualified immunity shielded a caseworker from a 42 U.S.C. § 1983 claim in connection with a negligent investigation claim. But the ground for reversal was that the trial court mistakenly applied the test for absolute immunity rather than for qualified immunity. Waller, 64 Wash. App. at 326, 335-36, 824 P.2d 1225. Division One remanded the case for application of the proper test. Waller, 64 Wash.App. at 336, 824 P.2d 1225. Waller does not support Petcu's claim because it did not hold that the constitutional right at issue was clearly established, but rather it remanded for application of the proper test. 64 Wash.App. at 336, 824 P.2d 1225.
*1249 The only case Petcu relies on that supports his claim is Lesley v. Dep't of Social & Health Servs., 83 Wash.App. 263, 921 P.2d 1066 (1996), review denied, 131 Wash.2d 1026, 939 P.2d 216 (1997). Lesley involved claims brought by an African American couple after CPS removed their child following allegations of child abuse. 83 Wash.App. at 267, 921 P.2d 1066. A day care worker notified CPS that she discovered suspicious marks on the child's backside. Lesley, 83 Wash.App. at 267, 921 P.2d 1066. The marks were Mongolian spots, birthmarks commonplace among African American and other dark-skinned children, but the caseworker concluded they were bruises and instituted dependency proceedings. In the parents' later tort action, the trial court ruled that qualified immunity shielded the caseworker from a 42 U.S.C. § 1983 claim. Lesley, 83 Wash.App. at 279, 921 P.2d 1066. On appeal, Division One reversed, holding that a question of fact existed as to whether a reasonable caseworker would have known "the contours of the well-established family unity right." Lesley, 83 Wash.App. at 279, 921 P.2d 1066.
We decline to follow Lesley because we believe that it is contrary to United States Supreme Court precedent requiring that a clearly established constitutional right be established with particularity based on prior decisional law. Saucier, 533 U.S. at 201, 121 S.Ct. 2151 (in finding whether a right is clearly established, it is necessary for the court to set forth principles which will become the basis for that right; this is accomplished case by case); Anderson, 483 U.S. at 640, 107 S.Ct. 3034; Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Lesley court assumed, without analysis, that a constitutional "family unity right" was well established. 83 Wash.App. at 279, 921 P.2d 1066. This falls short of the inquiry necessary to ensure that a state official had notice that his or her conduct would violate a constitutional right.
Petcu also calls our attention to White v. Dep't of Social & Health Servs., 78 Wash. App. 824, 838, 898 P.2d 331 (1995), aff'd and rev'd on other grounds, 131 Wash.2d 1, 929 P.2d 396 (1997). In White, we held that the free speech right to report suspected abuse of a nursing home resident was a clearly established constitutional right for purposes of a 42 U.S.C. § 1983 claim brought by a worker who suffered retaliation for doing so. 78 Wash.App. at 834-37, 898 P.2d 331. In support of its determination that the claimant's constitutional right was clearly established, our court looked to a state statute that required public employees to report suspected patient abuse. White, 78 Wash.App. at 833-34, 898 P.2d 331. Petcu relies on White for the proposition that we should infer the existence of a clearly established constitutional right from statutes and CPS policy manuals that emphasize the importance of maintaining family unity.
But Petcu construes White far too broadly. In White, we first determined the existence of a clearly established constitutional right of public employees to comment on matters of public concern based on prior decisional law. White, 78 Wash.App. at 833, 898 P.2d 331. Only then did we look to a state statute to determine whether reporting nursing home resident abuse was a matter of public concern. White, 78 Wash.App. at 833-34, 898 P.2d 331.
The White analysis differs from Petcu's claim that we can directly infer the existence of a constitutional right from a state statute. Petcu asserts that chapter 26.44 RCW and the CPS policy manual, both of which state the importance of the parent-child bond, "mimic[ ] the constitutional requirement" of family unity. Appellant's Br. at 40. Yet he fails to link the statute and policy to decisional authority that clearly establishes a constitutional right. In contrast, White involved the constitutional right to free speech, the contours of which had been established with much greater particularity than those of the "nebulous right of family integrity." Hodorowski v. Ray, 844 F.2d 1210, 1217 (5th Cir.1988).
In sum, Petcu cites no persuasive authority to show the existence of a clearly established constitutional right that could serve as the foundation for his 42 U.S.C. § 1983 claim. Nor does our survey of the legal landscape in 1993, the year in which Smith conducted her investigation, reveal a clearly established *1250 constitutional right that would negate her qualified immunity defense.
Although a parent has a constitutional right to the care and custody of a child, that right is not absolute. Caldwell v. LeFaver, 928 F.2d 331, 333 (9th Cir.1991). "The interest of the parents must be balanced against the interests of the State, and when conflicting, against the interests of the children." Woodrum v. Woodward County, 866 F.2d 1121, 1125 (9th Cir.1989) (although liberty interest exists in the maintenance of the family, this interest must be weighed against interest of child). "Because the interest in family unity must always be balanced against the competing interests involved, it is difficult, if not impossible, for officials to know when they have violated clearly established law." Frazier v. Bailey, 957 F.2d 920, 931 (1st Cir.1992).
We previously held that "there is no well-established constitutional right to the companionship of children whom one abused or neglected, and thus made dependent, according to a final and appealable dependency judgment." Miles v. Dep't of Social & Health Servs., 102 Wash.App. 142, 158, 6 P.3d 112 (2000), review denied, 142 Wash.2d 1021, 16 P.3d 1266 (2001). Here, of course, the finding of sexual abuse was overturned. But when Smith investigated, there was reasonable cause to believe that Petcu had sexually abused A.E.P.
Finally, in the absence of clear precedent, we may look to decisional law from other jurisdictions to determine whether a right is clearly established. Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir.1988). In doing so, we agree with other courts that the constitutional right to family unity is not a clearly established right when viewed in the context where there is reasonable cause to believe that a parent has sexually abused a child. Doe v. Louisiana, 2 F.3d 1412, 1415 (5th Cir.1993) (social workers entitled to qualified immunity even if they fabricate evidence and/or ignore exculpatory evidence because the constitutional right to family integrity is not clearly established); Frazier, 957 F.2d at 931 (no clearly established constitutional right to family integrity when father was separated from children resulting from a faulty investigation of sexual abuse allegations); Baker v. Racansky, 887 F.2d 183, 189 (9th Cir.1989) (no clear precedent establishing when social workers may take children into temporary protective custody upon allegations of sexual abuse); Myers v. Morris, 810 F.2d 1437, 1461 (8th Cir.1987) (no clearly established constitutional right to be free from leading or improper interviewing techniques during the investigation of allegations of child sexual abuse). See also Kruse v. State of Hawai'i, 68 F.3d 331, 336 (9th Cir. 1995) (no clearly established right to be free from child abuse investigation related to a mother's in utero transmission of marijuana to her unborn child).
Smith had reasonable cause to believe that Petcu sexually abused his children. The children's baby-sitter reported numerous instances of sexualized behavior involving A.E.P. and W.M.P. A.E.P. disclosed to Smith and six other adults that her father inappropriately touched her. Although our Supreme Court ultimately held that A.E.P.'s disclosures were inadmissible, at the time of Smith's investigation the disclosures raised reasonable suspicion that justified continued dependency proceedings.
In the context of reasonable cause to believe that a parent has sexually abused a child, there is no clearly established constitutional right that a CPS investigation proceed in a particular manner. Petcu argues that CPS procedures for investigating child abuse allegations put Smith on notice that she would be violating Petcu's constitutional rights by deviating from those procedures. We disagree. See Myers v. Scott County, 868 F.2d 1017, 1018 (8th Cir.1989) (deviations from proper investigative procedure while investigating allegations of child sexual abuse do not rise to the level of a constitutional violation). Assuming, without deciding, that Smith deviated from CPS procedures, we are not persuaded that her conduct rises to the level of a violation of Petcu's constitutional rights.
There is no precedent clearly establishing constitutionally adequate procedures for investigating allegations of child sexual abuse. Given the absence of more fact-specific law, *1251 we cannot conclude that a caseworker in Smith's position should have known that the interviewing techniques she employed with A.E.P., her failure to interview certain collateral witnesses, or her decision to pursue the dependency even in the face of mounting exculpatory evidence, violated Petcu's constitutional right to family unity.
Because Smith's investigation was founded upon reasonable cause to believe that Petcu sexually abused his children, we affirm the trial court's ruling that qualified immunity shielded her from Petcu's 42 U.S.C. § 1983 claim.

Statute of Limitations
Petcu agrees that the statute of limitations began to run no later than August 25, 1993, the date that Kyle Smith testified during the dependency proceedings. Because Petcu did not file suit until October 2000, his claims are time barred unless the limitations period tolled.
Petcu argues that the statute of limitations on his claims tolled from the time the trial court entered its dependency orders until the Supreme Court overturned the dependency findings. He reasons that while the dependency findings were in effect, collateral estoppel barred him from filing suit against the State for negligent investigation. Thus, he argues, equity demands that the limitations period toll during that period. We disagree.
Personal injury actions are governed by a three year statute of limitations. RCW 4.16.080(2). Thus, a claim for negligent investigation must be brought within three years of the date the action accrues. For an adult, a cause of action accrues from the date a claimant knew or should have known the factual basis for the elements of the claim, including duty, breach, causation, and damages.[7]Allen v. State, 118 Wash.2d 753, 757-58, 826 P.2d 200 (1992).
The statutory grounds for tolling the statute of limitations are set forth in RCW 4.16.180-.240. Not one of these provisions applies to Petcu's negligence claims. RCW 4.16.230 specifies when judicial proceedings toll the statute of limitations, providing: "When the commencement of an action is stayed by injunction or a statutory prohibition, the time of the continuance of the injunction or prohibition shall not be a part of the time limited for the commencement of the action." RCW 4.16.230. Here, no injunction or statutory prohibition prevented Petcu from filing his claims.
Petcu refers to the doctrine of collateral estoppel, arguing that it is a "positive rule of law" which operated to preclude him from bringing suit within the limitations period. Appellant's Br. at 31. When some positive rule of law prevents a person from exercising a legal remedy, the time during which suit is barred may be excluded from the limitations period even though the statute does not provide such an exception. Broad v. Mannesmann Anlagenbau, A.G., 141 Wash.2d 670, 682, 10 P.3d 371 (2000). The cases that Petcu relies on to support his claim that collateral estoppel is such a positive rule of law are distinguishable because they involve situations in which a plaintiff is barred from bringing suit. Broad, 141 Wash.2d at 683-85, 10 P.3d 371 (holding that the statute of limitations for service of process tolls when an international treaty that preempts state law prevents a plaintiff from ensuring timely service); State v. Klinker, 85 Wash.2d 509, 524 n. 8, 537 P.2d 268 (1975) (holding that it would be inequitable to permit the statute of limitations to run while there is no constitutionally adequate procedure to bring a claim); Seamans v. Walgren, 82 Wash.2d 771, 775, 514 P.2d 166 (1973) (holding that the statute of limitations tolls for the period a defendant legislator is immune from service of process); In the Matter of Bailey's Estate, 178 Wash. 173, 178, 34 P.2d 448 (1934) (holding that the statute of limitations tolled while claimant was prevented from bringing suit against an estate administrator after the estate's assets escheated to the state).
The doctrine of collateral estoppel is an affirmative defense that, when applicable, may result in dismissal but does not bar *1252 commencement of a lawsuit. State Farm Mut. Auto. Ins. Co. v. Avery, 114 Wash.App. 299, 304, 57 P.3d 300 (2002); Hadley v. Maxwell, 144 Wash.2d 306, 311, 27 P.3d 600 (2001); Philip A. Trautman, Claim and Issue Preclusion in Civil Litigation in Washington, 60 Wash. L.Rev. 805, 812-13 (1985). Whether Petcu could bring his claims depended on whether he could allege facts sufficient to prove each element of negligent investigation.
Collateral estoppel does not apply unless it is invoked by the party in whose favor it would operate. Because collateral estoppel is an affirmative defense, the State carries the burden to prove those facts which establish the defense. Spahi v. Hughes-Northwest, Inc., 107 Wash.App. 763, 774, 27 P.3d 1233 (2001). Even when the doctrine clearly applies, a failure to plead and prove collateral estoppel constitutes a waiver of the defense. See Riblet v. Ideal Cement Co., 57 Wash.2d 619, 620, 358 P.2d 975 (1961) (affirming jury verdict in favor of defendant cement company in a nuisance action when the claimants failed to invoke collateral estoppel to prevent relitigation of whether cement dust emitted from the plant harmed adjacent property). Thus, the availability of the doctrine of collateral estoppel as an affirmative defense does not affect whether Petcu could make out a prima facie case of negligent investigation.
Although the doctrine of collateral estoppel may have reduced Petcu's chances of prevailing, it did not preclude him from filing a lawsuit. The apparent improbability of success does not remove the responsibility to file a lawsuit within the statute of limitations. Stephens v. Stephens, 85 Wash.2d 290, 295, 534 P.2d 571 (1975) (holding that the statute of limitations did not toll during the period when common law interspousal immunity from tort liability remained in effect).
In Stephens, the court held that interspousal immunity from tort liability was not a "positive rule of law" of the sort contemplated by Seamans, but merely adverse decisional authority which could not excuse the failure to file suit within the limitations period. Stephens, 85 Wash.2d at 293, 534 P.2d 571. "[A] suitor cannot toll or suspend the running of the [limitations period] by relying upon the uncertainties of controlling law. It is incumbent upon him to test his right and remedy in the available forums." Stephens, 85 Wash.2d at 294, 534 P.2d 571.
Collateral estoppel is even less like a "positive rule of law" than the common law doctrine of interspousal tort immunity. Rather, it is a court-created concept subject to flexible, pragmatic application. Trautman, 60 Wash. L.Rev. 805, 812-13.
For collateral estoppel to bar a claim, the following requirements must be met: identity of issues between the original and subsequent action; a final judgment on the merits; the same party or privity with the prior party; and absence of injustice against the party against whom the doctrine is being applied. Rains v. State, 100 Wash.2d 660, 665, 674 P.2d 165 (1983).
"Collateral estoppel precludes a party from relitigating an issue of fact that the party has already litigated to final judgment, so long as injustice does not result." Miles, 102 Wash.App. at 153, 6 P.3d 112. Collateral estoppel is meant to provide finality to judgments once a party has had the full opportunity to litigate an issue to conclusion. State Farm, 114 Wash.App. at 304, 57 P.3d 300.
A party may be collaterally estopped from relitigating the issue of whether a child has been abused following a dependency judgment that is final and appealable. In Miles, we held that parents were collaterally estopped from challenging a dependency court's finding of child abuse during subsequent litigation of a negligent investigation claim. 102 Wash.App. at 152-53, 6 P.3d 112. There, the parents had entered an agreed order of dependency and 26 doctors had agreed to the facts constituting the abuse. Miles, 102 Wash.App. at 146-47, 6 P.3d 112.
But in Lesley, Division One held that parents were not collaterally estopped from bringing a claim for negligent investigation after their child was removed following a shelter care hearing. 83 Wash.App. at 276, 921 P.2d 1066. The Lesley court reasoned that collateral estoppel was inapplicable not only because the removal order was not final *1253 and appealable, but also because the issue of whether a caseworker conducted a negligent investigation differs from the issue of whether reasonable cause exists to order removal. 83 Wash.App. at 276-77, 921 P.2d 1066. In Lesley, the parents were separated from their child after a CPS caseworker mistook common birthmarks for bruises, ignoring evidence to the contrary. Lesley, 83 Wash.App. at 266-67, 921 P.2d 1066.
As shown by Miles and Lesley, the application of collateral estoppel depends on the facts of each case. The court's concern with reaching a just result in a particular case prevails over the desire for finality. Thus, it is by no means certain that collateral estoppel would apply to Petcu's claims even if the State were to assert the defense. Petcu could have either challenged the applicability of collateral estoppel or sought a stay of his civil suit pending appellate resolution of the dependency. Either approach could have avoided any injustice that may have resulted if collateral estoppel prevented Petcu from contesting the dependency findings during his negligent investigation claim.
Petcu argues that it would be unjust to require that he pursue a civil suit within the limitations period while "forced to wade through the appellate process" in order to get his children back. Appellant's Reply Br. at 17. We are not unmindful of the difficulty of pursuing a civil suit simultaneously with the appeal of a dependency judgment. But a showing of hardship or understandable delay is insufficient to support tolling of the statute of limitations. Allen, 118 Wash.2d at 758, 826 P.2d 200 (holding that a wife's grief over her husband's murder did not excuse her failure to file a wrongful death action within the limitations period).
Because the statute of limitations did not toll pending resolution of Petcu's appeal, the trial court correctly ruled that his claims were time-barred.
Affirmed.
We concur: SEINFELD, J., and HUNT, C.J.
NOTES
[1] The purpose of a shelter care hearing is to determine whether there is reasonable cause to believe that the release of a child to his or her parents would pose a serious threat of substantial harm. At a shelter care hearing, a parent is entitled to respond to general allegations of abuse.
[2] An instrument for determining and registering variations in the size of an organ or limb and in the amount of blood present or passing through it. Webster's Third New Int'l Dictionary 1740 (1976).
[3] But Smith's service record shows that she had a telephone conversation with Dr. Shaw on April 15, 1993, when Dr. Shaw said she was not qualified to perform a sexual abuse examination. Further, Detective Kelly interviewed Dr. Shaw at her office and included the results of his interview together with the children's medical records in his investigative report.
[4] RCW 26.44.050 states in relevant part: "Upon the receipt of a report concerning the possible occurrence of abuse or neglect, ... the department of social and health services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court."
[5] We reject Petcu's argument that the trial court gives more weight to information DSHS presents than to information he presents. We assume that the trial court reviews all credible material properly submitted without giving undue weight to one side.
[6] Petcu argues that as a result of Smith's improper interviewing techniques, A.E.P.'s testimony was irreparably tainted such that the court was deprived of her accurate testimony. But we believe that the hypothetical existence of allegedly tainted testimony is too speculative to constitute "material information" within the meaning of Tyner, 141 Wash.2d at 78-81, 1 P.3d 1148.
[7] The statute of limitations for Petcu's children's claims tolled under RCW 4.16.190.