# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| FEARGHAL MCCARTHY, CONOR MCCARTHY, a minor, by and through Fearghal McCarthy, his father; and CORMAC MCCARTHY, a minor, by and through Fearghal McCarthy, his father, | No. 46347-4-II |
| Appellants, | |
| v. | |
| COUNTY OF CLARK, CITY OF VANCOUVER, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, CHILDREN'S PROTECTIVE SERVICES, | PART PUBLISHED OPINION |
| Respondents. | |

MAXA, J. − Fearghal McCarthy and his sons, CPM and CCM, appeal the trial court's dismissal on summary judgment of their multiple claims against Clark County, the Department of Social and Health Services (DSHS), and the City of Vancouver arising from a report by Fearghal's then wife Patricia McCarthy[1] that he had struck two-year-old CCM on the head. Based on the report, a Clark County deputy sheriff arrested Fearghal, DSHS investigated for possible child abuse, and Vancouver prosecuted criminal charges. Patricia later admitted that her report was false.

---

[1] Because they have the same last name, we refer to Fearghal McCarthy and Patricia McCarthy by their first names. We mean no disrespect.

No. 46347-4-II

Fearghal, CPM, and CCM filed suit against Clark County, DSHS, and Vancouver. Their primary claim was that all three defendants negligently conducted investigations required under RCW 26.44.050 of Patricia's report that Fearghal had struck CCM, which resulted in Fearghal and the children being separated for an extended period. Fearghal and CPM/CCM also asserted several other causes of action against one or more of the defendants. The trial court granted summary judgment in favor of all three defendants on all claims.

In the published portion of this opinion, we hold that the trial court properly granted summary judgment on the negligent investigation claims under RCW 26.44.050. In the unpublished portion of this opinion, we hold that the trial court properly granted summary judgment on the remainder of Fearghal's and CPM/CCM's claims. Accordingly, we affirm the trial court's grant of summary judgment in favor of Clark County, DSHS, and Vancouver on all claims.

FACTS

Fearghal and Patricia married in 1998 and had two sons: CPM, born in 1999, and CCM, born in 2003.

*Patricia's Report of Abuse and Deputy Kingrey's Investigation*

On the afternoon of June 3, 2005, Patricia called 911 from her church to report that Fearghal had struck CCM on the head twice the prior evening, knocking him to the floor. Deputy Ed Kingrey of the Clark County Sheriff's Office was the responding officer.

Kingrey did not meet Patricia in person, but he spoke with her about the incident over the phone. Patricia told Kingrey that over the past year Fearghal had been physically and emotionally abusive to her and her small boys, and a week earlier he had shoved her and grabbed

2

her by the neck in a fit of rage. Patricia said that the previous evening CCM was crying "Mommy, mommy" during dinner time and Fearghal told her to "make him shut-up o[r] else I will." Clerk's Papers (CP) at 241. According to Patricia, when CCM continued to cry Fearghal whacked him twice on the head, causing CCM to hit his head on the table and fall off of his chair onto the floor. Kingrey asked Patricia if CCM had any injuries, and she said that there were no visible marks.

Kingrey also talked with Patricia's mother, Regina Greer, over the phone. Greer said that CPM had told her that he had seen Fearghal physically abuse Patricia and had told her about the incident when Fearghal hit CCM. Kingrey did not ask to speak with CPM, who at that time was five years old. He also did not ask to examine CCM for injuries.

Kingrey went to the McCarthys' residence and spoke with Fearghal in person. Fearghal denied that the incident had happened and denied striking CCM. According to Fearghal, he told Kingrey that Patricia was abusing pain medications and had been high on prescription medications the night before, that she had been reporting delusions in the last year since her sister committed suicide, and that she was taking medication for anxiety and other mental health issues. He also showed Kingrey the various prescription medications that Patricia was taking. Fearghal submitted declarations stating that Kingrey was dismissive and refused to listen to his attempts to explain Patricia's history of anxiety, panic attacks, and drug use, and that Kingrey let him know that the information he provided about Patricia did not matter.

*Fearghal's Arrest and First No-Contact Order*

Kingrey arrested Fearghal for fourth degree assault-domestic violence against both CCM and Patricia and booked him into jail. Kingrey subsequently submitted a declaration of probable

3

cause to support his arrest of Fearghal without a warrant. The declaration recited what Patricia had told him about Fearghal's assault of her and the incident where he struck CCM, and Greer's statement that CPM had told her that he had seen Fearghal strike Patricia and CCM. The declaration stated that Fearghal had denied abusing any member of his family, but it did not mention Fearghal's statements that Patricia had been high on prescription medications on the night of the incident or that she had been reporting delusions and was taking medication for mental health issues. The declaration also did not state that there was no physical evidence that Fearghal had hit CCM. Based on Kingrey's declaration, the district court found there was probable cause to arrest.

On June 6, the district court arraigned Fearghal on the fourth degree assault charges. At the arraignment, the district court issued a no-contact order because domestic violence was involved. The order prevented Fearghal from having any contact with CCM, including by telephone and writing, and prohibited him from coming within 500 feet of CCM's residence and daycare. This order remained in effect until March 20, 2006.

*Investigation of Child Protective Services*

The day after Fearghal's arrest, Greer took CCM to the emergency room. She told the doctor about Fearghal hitting CCM, and the doctor referred the incident to Child Protective Services (CPS). The case was assigned to social worker Patrick Dixson for investigation.

On June 13, Dixson met with Patricia, and she told him about Fearghal hitting CCM on June 2 and other incidents of abuse. Patricia agreed to a voluntary safety plan suggested by Dixson. The safety plan provided that Patricia would (1) not allow Fearghal to have contact with

the children until the no-contact order was lifted, (2) seek domestic violence counseling, and (3) keep the children safe from domestic violence.

Dixson claimed that he also met with CPM and CCM when he met with Patricia. However, CPM said he did not remember meeting Dixson and CCM's daycare records indicate that CCM was at daycare at the time of the alleged meeting. Dixson did not speak to Fearghal during his investigation because he believed Fearghal was out of the country and also that interviewing him would interfere with the law enforcement investigation.

Dixson did not receive any further information about the incident after his meeting with Patricia on June 13. However, he did not issue a report concerning his investigation for another 10 months. Dixson finally closed his investigation on April 12, 2006, concluding that the initial referral was "founded," and sent his report to his supervisor.

*Initial Involvement of City Attorney Petty*

After Fearghal's arrest for fourth degree assault, the case was assigned to Vancouver assistant city attorney Jill Petty, who was part of the Domestic Violence Prosecution Center (DVPC). Petty first contacted Patricia about the case on June 6, 2005. Petty had a few phone calls and one face-to-face meeting with Patricia. Patricia claims that in those conversations she told Petty that she "was reticent about the allegations within the police report and wanted to recant." CP at 411. Patricia claims that Petty pressured her into cooperating by making various threats, including telling Patricia that if she recanted she likely would lose custody of the children in a dissolution action, Petty would notify CPS and they would take away her children, and Patricia would be prosecuted for making a false police report.

Patricia also claims that Petty told her to file a petition for a protection order that would eject Fearghal from the family home and prevent him from seeing the children, and that Petty encouraged her to file for a divorce.

On July 8, Petty filed an information in district court charging Fearghal with fourth degree assault-domestic violence against CCM.

*Superior Court Protection Order*

On July 28, Patricia petitioned the superior court for a temporary protection order requiring Fearghal to vacate the family home and prohibiting Fearghal from contacting her, CPM, and CCM. The superior court issued the temporary protection order. The original order was to be in effect until August 10, but was extended until August 31. DSHS was not involved in this proceeding.

*Temporary Mutual Restraining Order*

On August 9, Patricia filed a petition for dissolution of her marriage with Fearghal. On August 31, the family court entered a temporary mutual restraining order preventing Fearghal from contacting Patricia and preventing Patricia from contacting Fearghal.[2] The restraining order allowed Fearghal limited supervised contact with CPM.

The restraining order prohibited both Fearghal and Patricia from "assaulting, harassing, molesting or disturbing the peace of the other party or of any child" and from "going onto the grounds of or entering the home of the other party." The restraining order also indicated that

---

[2] The record is unclear regarding how long the restraining order actually remained in effect. The original order expired after one year, but the parties and law enforcement treated the restraining order as in effect after August 31, 2006.

violation of the order was a criminal offense under chapter 26.50 RCW and would subject the violator to arrest. DSHS was not involved in this proceeding.

*Patricia's Report of Fearghal's No-Contact Order Violations*

Patricia claims that Petty asked her about what other criminal charges could be filed against Fearghal. Petty told her that the more charges that were filed against him the easier it would be to convict him and have him deported because he was not a United States citizen. Petty also told Patricia to obtain and bring to her fitness club records to show that Fearghal had violated the no-contact order by going to a fitness club when Patricia was there with the children. Then Petty directed Patricia to report the violation.

On August 12, Patricia reported to the police that Fearghal had violated the June 6 no-contact order three times. Vancouver Police Officer Kortney Langston took Patricia's report and forwarded his report to the DVPC. On November 10, Petty filed new charges against Fearghal for the three violations of the no-contact order.

*Fearghal's Second No-Contact Order*

On December 8, the district court in the criminal action entered a domestic violence no-contact order preventing Fearghal from coming within 250 feet of CCM's residence for five years. This no-contact order remained in effect until terminated on October 6, 2006.

*CPM's Denial of Abuse*

On January 11, 2006, Petty and Fearghal's criminal defense attorney jointly interviewed CPM. CPM was emphatic that Fearghal did not hit CCM. There is no indication that this information was conveyed to DSHS at this time.

*Additional Charges and Transfer to Superior Court*

Patricia reported to law enforcement that Fearghal had given her a three-page letter with detailed instructions for her to follow to help him have the charges dropped. The letter included instructions that Patricia delete emails from Fearghal and use a calling card to contact him. It also included a detailed account of Fearghal's version of events and how Patricia should align her story with his. A Vancouver detective investigated and forwarded her report to the DVPC with the recommendation that Fearghal be charged with witness tampering.

Petty transferred the case to the Clark County Prosecuting Attorney's Office to charge Fearghal with felony witness tampering. On January 31, the prosecutor filed an amended information charging Fearghal with witness tampering and fourth degree assault-domestic violence of CCM in the superior court.

On March 20, the district court dismissed Fearghal's fourth degree assault charge and rescinded the initial no-contact order that had been issued when Fearghal was arraigned.

*Dissolution Restraining Order*

On February 15, the superior court commissioner handling the dissolution action issued an order terminating all contact between Fearghal and CPM until further notice by the court. DSHS was not involved in this proceeding.

*Fearghal's Third No-Contact Order*

On February 21, the superior court in Fearghal's new criminal case entered a pretrial domestic violence no-contact order preventing Fearghal from coming within 500 feet of Patricia's or CCM's residence, school, or place of employment for two years.

*"Founded" Finding by DSHS*

On April 21, Dixson's supervisor sent Fearghal a letter informing him that the investigation concluded that the allegation that Fearghal struck CCM was "founded." Fearghal appealed the finding on May 8. In June, a DSHS area administrator reviewed Fearghal's appeal, and upheld the "founded" finding.

*Fearghal's Guilty Plea and Fourth No-Contact Order*

Fearghal eventually agreed to plead guilty to a reduced charge of disorderly conduct. On August 1, Fearghal entered a guilty plea to disorderly conduct for the incident with CCM. He was sentenced to 15 days in custody with credit for four days served, and with the remainder to be served on a work crew.

The superior court entered a post-conviction domestic violence no-contact order as a result of Fearghal's disorderly conduct conviction. The order prohibited Fearghal from coming within 500 feet of the residence, school, or place of employment of Patricia or CCM for two years. This no-contact order remained in effect until April 6, 2007.

*"Inconclusive" Finding by DSHS*

In October 2006, the same DSHS area administrator who had upheld the "founded" finding revised the finding to "inconclusive." The change was made in light of new information provided by Fearghal, including that CPM stated that Fearghal had not hit CCM, indications that Patricia had coached CPM, new information that called into question Patricia's credibility, and Fearghal's plea deal that reduced the fourth degree assault to disorderly conduct.

No. 46347-4-II

*Rescission of Fourth No-Contact Order*

On April 6, 2007, the superior court rescinded its August 1, 2006 post-conviction domestic violence no-contact order. The superior court entered a new order that imposed prohibitions only with respect to Patricia.

*Custody Issues Resolved*

In October 2008, Patricia and Fearghal agreed to a parenting plan making Fearghal the primary parent and sole decision maker. In a lengthy "Stipulated Findings of Fact" drafted and signed by Patricia and Fearghal in their dissolution proceeding, Patricia admitted to fabricating allegations against Fearghal, including the June 3, 2005 report that Fearghal had struck CCM.

*Procedural History*

Fearghal and CPM/CCM filed suit against Clark County, DSHS, and Vancouver in August 2008. The complaint asserted multiple causes of action on behalf of both Fearghal and CPM/CCM.

The defendants filed several summary judgment motions during the litigation, and the trial court eventually entered orders granting summary judgment in favor of all defendants and dismissing all claims. Fearghal and CPM/CCM appeal the summary judgment orders.

ANALYSIS

Fearghal and CPM/CCM allege that questions of fact exist as to whether Clark County, DSHS, and Vancouver conducted negligent investigations of Patricia's report that Fearghal struck CCM, which resulted in Fearghal being separated from his children. We hold that (1) questions of fact exist as to whether Kingrey was negligent in his investigation, but Clark County is not subject to liability under RCW 26.44.050 because Kingrey's alleged negligence did not

10

result in a "harmful placement decision;" (2) questions of fact exist as to whether Dixson was negligent in his investigation, but DSHS is not subject to liability under RCW 26.44.050 because Fearghal failed to show that Dixson's alleged negligence was the proximate cause of any harmful placement decision; and (3) Petty has prosecutorial immunity and therefore Vancouver is not subject to liability under RCW 26.44.050 because Fearghal failed to create a genuine issue of material fact regarding whether Petty acted outside her role as a prosecutor.

A.      STANDARD OF REVIEW

We review a trial court's order granting summary judgment de novo. *Lyons v. U.S. Bank NA*, 181 Wn.2d 775, 783, 336 P.3d 1142 (2014). We review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013).

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation. *Dowler v. Clover Park Sch. Dist.*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011). If reasonable minds can reach only one conclusion on an issue of fact, that issue may be determined on summary judgment. *Failla v. FixtureOne Corp.*, 181 Wn.2d 642, 649, 336 P.3d 1112 (2014).

B.      NEGLIGENT INVESTIGATION – LEGAL PRINCIPLES

RCW 26.44.050 provides that law enforcement and DSHS must investigate reports of abuse or neglect of a child:

> Upon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health

11

> services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

Based on this statutory duty, parents and children have an implied cause of action against law enforcement and DSHS for negligent investigation under certain circumstances. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). This cause of action extends to parents who are suspected of abusing their children. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 82, 1 P.3d 1148 (2000).

The negligent investigation cause of action based on RCW 26.44.050 is a "narrow exception" to the rule that there is no general tort claim for negligent investigation. *M.W.*, 149 Wn.2d at 601. A negligent investigation claim is available only when law enforcement or DSHS conducts an incomplete or biased investigation that "resulted in a harmful placement decision." *Id.* A harmful placement decision includes "removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *Id.* at 602. This "harmful placement decision" requirement is strictly applied. *See Roberson v. Perez*, 156 Wn.2d 33, 46-47, 123 P.3d 844 (2005) (rejecting a "constructive placement" argument and holding no harmful placement decision occurred when parents voluntarily sent child to live with grandparents during abuse investigation).

To prevail on a negligent investigation claim, the claimant must prove that the faulty investigation was a proximate cause of the harmful placement. *Petcu v. State*, 121 Wn. App. 36, 56, 86 P.3d 1234 (2004); *see also Tyner*, 141 Wn.2d at 82. Proximate cause has two elements: cause in fact and legal causation. *Tyner*, 141 Wn.2d at 82. Cause in fact exists when "but for" the defendant's actions, the claimant would not have been injured. *Id.* Cause in fact generally is

a jury question. *Id.* Legal causation involves a policy determination as to how far the consequences of an act should extend and generally is a legal question.[3] *Id.*

A negligent investigation may be the cause in fact of a harmful placement even when a court order imposes that placement. *Id.* at 83. Liability in this situation depends upon what information law enforcement or DSHS provides to the court. *Id.* at 86, 88. A court order will act as a superseding cause that cuts off liability "only if all material information has been presented to the court." *Id.* at 88. Materiality is a question of fact unless reasonable minds could only reach one conclusion. *Id.* at 86.

C.    CLARK COUNTY LIABILITY

Fearghal and CPM/CCM argue that the trial court erred in granting summary judgment in favor of Clark County because Kingrey conducted a negligent investigation of Patricia's allegation of child abuse, which was a proximate cause of his separation from his children. We agree that there is a question of fact regarding whether Kingrey's investigation was negligent, but hold as a matter of law that the no-contact orders issued in Fearghal's criminal proceedings do not constitute "harmful placement decisions" for the purpose of a negligent investigation claim under RCW 26.44.050.[4]

---

[3] Fearghal and CPM/CCM argue that we should apply the substantial factor test to evaluate proximate cause. The respondents argue that (1) the argument cannot be raised on appeal because it was not properly raised below and (2) the substantial factor test has never been applied to negligent investigation and there is no compelling reason to extend the test to such situations. We decline to apply the substantial factor test, but we note that applying the substantial factor test would not alter the conclusions of this opinion.

[4] Nothing in the record indicates that the superior court protection and restraining orders issued in the dissolution actions were based on Kingrey's investigation. Therefore, our analysis of Clark County's liability focuses only on the no-contact orders issued in Fearghal's criminal cases.

1.    Negligent Investigation

Fearghal and CPM/CCM argue that there is a genuine issue of material fact as to whether Kingrey's investigation was negligent.  We agree.

RCW 26.44.050 describes a law enforcement officer's duty to investigate with broad language and does not "limit the officer's required response to certain specified acts or time periods, but provides a general mandatory duty to investigate."  *Rodriguez v. Perez*, 99 Wn. App. 439, 448, 994 P.2d 874 (2000).  Whether an officer has fulfilled the duty to investigate is a question of fact.  *See Yonker v. Dep't of Soc. & Health Servs.*, 85 Wn. App. 71, 76, 930 P.2d 958 (1997) ("Once a duty is established, whether the defendant breached the duty and whether that breach was a proximate cause of the plaintiff's injuries are normally questions of fact.").

Here, Kingrey did not meet with Patricia in person, examine CCM for injury, or interview CPM about Fearghal's alleged abuse.  Kingrey did interview Fearghal, but there was evidence that he was dismissive and refused to listen when Fearghal told him that Patricia was high on prescription medications the night before, that she had been reporting delusions, and that she was taking medication for anxiety and other mental health issues.  Kingrey did not ask Patricia about her prescription drug use or ask her why Fearghal would say she was delusional.

Fearghal and CPM/CCM also submitted a declaration from Bruce Hall, a retired lieutenant with the Vancouver Police Department.  Hall testified that Kingrey's investigation was "rife with many errors, and it displays a predisposition toward arrest that was not warranted under the circumstances."  CP at 1852.

Viewing the facts in the light most favorable to Fearghal and CPM/CCM, we hold that a genuine issue of fact exists whether Kingrey's investigation was incomplete or biased.

    2.    Harmful Placement Decision

Fearghal and CCM/CPM argue that the no-contact order issued by the district court following Fearghal's arrest was a harmful placement decision, which is required for RCW 26.44.050 liability.  We disagree.

The district court issued the initial no-contact order pursuant to RCW 10.99.040(2)(a), which states:

> Because of the likelihood of repeated violence directed at those who have been victims of domestic violence in the past, when any person charged with or arrested for a crime involving domestic violence is released from custody before arraignment or trial on bail or personal recognizance, the court authorizing the release may prohibit that person from having any contact with the victim.

The question here is whether such a no-contact order issued in a criminal proceeding constitutes a placement decision for purposes of negligent investigation liability under RCW 26.44.050. This is a question of first impression.

As discussed above, a harmful placement decision includes "removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home." *M.W.*, 149 Wn.2d at 602.  The only possible placement decision in this case is removing a child from a nonabusive home.

Two cases have addressed a claim for removing a child from a nonabusive home.[5]  In *Tyner*, a DSHS caseworker submitted a declaration in support of a motion for a temporary protective order filed by the plaintiff's wife, in which he recommended that the court prohibit all contact between the plaintiff and his children.  141 Wn.2d at 73.  The trial court granted the

---

[5] In a third case, *Roberson*, the plaintiffs voluntarily relinquished guardianship of their child and claimed that DSHS's conduct had resulted in a "constructive placement" decision.  156 Wn.2d at 46.  The Supreme Court held that DSHS had not caused a harmful placement decision.  *Id.* at 47.

wife's motion. *Id.* A few days later, DSHS filed a dependency petition that following a shelter care hearing resulted in a court order prohibiting all contact between the plaintiff and his children. *Id.* at 74. In *Petcu*, DSHS took the plaintiff's children into protective custody and then filed a dependency petition that resulted in the children being placed with their mother in Portland. 121 Wn. App. at 44-46, 48.

The courts in *Tyner* and *Petcu* assumed that a harmful placement decision had occurred. *See Tyner*, 141 Wn.2d at 89 (affirming a jury's finding of liability against DSHS when the negligent investigation resulted in a court orders limiting contact between a parent and his children); *Petcu*, 121 Wn. App. at 61 (affirming summary judgment in favor of DSHS because the there was no proximate cause between the investigation and the court's dependency order). However, both cases involved dependency proceedings specifically designed to determine whether to maintain the parent-child relationship and where the children should live. *Tyner*, 141 Wn.2d at 74; *Petcu*, 121 Wn. App. at 48. In both cases, DSHS actually requested a placement decision. *Tyner*, 141 Wn.2d at 74; *Petcu*, 121 Wn. App. at 46. And in both cases, the trial court conducted shelter care hearings to address residency issues. *Tyner*, 141 Wn.2d at 74; *Petcu*, 121 Wn. App. at 46.

Here, the facts are completely different. The district court's June 6, 2005 no-contact order was issued as a result of a criminal charge, not a dependency petition. The order arose from the district court's arraignment, which was designed to address the criminal charges and not the parent-child relationship. Clark County did not request any placement decision. The district court did not conduct a shelter care hearing or any similar hearing to address residency issues.

16

The negligent investigation cause of action based on RCW 26.44.050 is designed to be a narrow exception to the rule that there is no general tort claim for negligent investigation. *M.W.*, 149 Wn.2d at 601. As a result, we interpret the "harmful placement decision" requirement narrowly. *See Roberson*, 156 Wn.2d at 46-47. There is no indication in the limited case law in this area that a no-contact order issued in criminal proceedings that is not designed to address the parent-child relationship and the child's residence can trigger liability under RCW 26.44.050.

We hold that a "harmful placement decision" for purposes of RCW 26.44.050 negligent investigation liability does not include a no-contact order issued pursuant to RCW 10.99.040(2)(a) at the arraignment of a parent on domestic violence charges. Accordingly, we hold that Clark County cannot be liable for negligent investigation under RCW 26.44.050 and the trial court did not err in granting summary judgment in favor of Clark County on this claim.

D.    DSHS LIABILITY

Fearghal and CPM/CCM argue that the trial court erred in granting summary judgment in favor of DSHS because Dixson's untimely and negligent investigation of Fearghal regarding the incident with CCM prolonged Fearghal's separation from his children by impeding his efforts to convince the courts to remove the no-contact and restraining orders that were in place. We agree that there is a question of fact regarding whether Dixson's investigation was negligent, but hold that Fearghal failed to show that the investigation was the proximate cause of a harmful placement decision.

1.    Dixson Investigation

Fearghal and CPM/CCM argue that there is a genuine issue of material fact as to whether Dixson's investigation was negligent. We agree.

17

Fearghal asserts that Dixson's investigation did not comply with CPS practices and procedures in various ways. He claims that Dixson failed to contact the referring emergency room doctor. And Fearghal asserts that Dixson failed to interview the children within 10 days and instead falsely reported meeting with CPM and CCM on June 13, 2005. Dixson also did not interview Fearghal or even notify Fearghal of his investigation. Nevertheless, Dixson made a "founded" finding regarding Patricia's allegations.

In addition, there is evidence that Dixson failed to comply with other CPS practices and procedures. For example, Dixson failed to complete his report within 90 days as required by CPS, and he entered his notes into the DSHS records system up to 10 months after conducting his interviews.

Viewing the facts in the light most favorable to Fearghal and CPM/CCM, we hold that a genuine issue of fact exists whether Dixson conducted a negligent investigation.

2. Proximate Cause

A successful negligent investigation claim must show that the investigation caused a harmful placement decision. *M.W.*, 149 Wn.2d at 601. Here, Fearghal and CPM/CCM argue that Dixson's investigation was a proximate cause of the ongoing protection orders against him in the civil proceedings.[6] They claim that if Dixson had conducted a proper investigation, Fearghal would have been able to use the DSHS investigation to persuade the superior court to stop issuing new protection and restraining orders and to rescind existing protection orders. We

---

[6] Fearghal and CPM/CCM make the same argument regarding the no-contact orders issued in Fearghal's criminal proceedings. But as discussed above, we hold that no-contact orders issued in criminal proceedings are not "harmful placement decisions" for purposes of negligent investigation liability under RCW 26.44.050. Because our ruling above controls the outcome, we do not address this argument in the context of DSHS's liability.

hold that Dixson's negligent investigation was not a proximate cause of any harmful placement decision by the superior court.

Initially, there is no evidence that any court relied on or was aware of the DSHS investigation when making the decision to enter or extend a protection order. Unlike in *Tyner*, DSHS was not involved in Patricia's petition for a protection order in July 2005 or in her subsequent dissolution proceedings, and the superior court was not relying on DSHS for information. Therefore, there was no direct causal connection between Dixson's conduct and issuance of the initial temporary protection order or the subsequent restraining orders issued in the dissolution proceedings.

Fearghal argues that DSHS caused a placement decision because it failed to present a timely inconclusive finding to the courts. But the facts here are different than those in *Tyner*, where the court affirmed the jury's finding of causation because the caseworker controlled the flow of information to the trial court that entered the no-contact order. 141 Wn.2d at 88-89. The caseworker initially recommended that the court remove the father from the home, but then he failed to inform the court when he ultimately concluded the allegations of abuse were unfounded. *Id.* at 73-74. The court noted that negligence investigation liability arises from the concealment of information or the negligent failure to discover material information. *Id.* at 83-84.

Here, DSHS did not control the flow of information to the court. First, as noted above and unlike in *Tyner*, DSHS was never involved in the superior court proceedings. And there is no evidence that any court relied on information from DSHS, sought any information from DSHS, or considered the DSHS investigation in any way. Second, there is no evidence that

DSHS had any information that was not already in front of the superior court.[7]  Third, there is no

evidence that an "inconclusive" finding would have caused the superior court to change its

decision to issue a protection or restraining order or caused the termination of an existing order.

Reasonable minds could not conclude that Dixson's negligent investigation was the

proximate cause of the superior court's protection and restraining orders.  Accordingly, we hold

that DSHS cannot be liable for negligent investigation under RCW 26.44.050 and that the trial

court did not err in granting summary judgment in favor of DSHS on this claim.

E.     VANCOUVER LIABILITY

Fearghal and CPM/CCM argue that the trial court erred in granting summary judgment in

favor of Vancouver because although a prosecutor generally is immune from liability, Petty lost

her immunity when she stepped outside of her role as prosecutor and took an investigative role in

Fearghal's case.  We disagree.

1.     Prosecutor's Liability/Immunity Under RCW 26.44.050

RCW 26.44.050 states that a "law enforcement agency" must investigate a report of child

abuse.  Prosecuting attorneys fall within the definition of "law enforcement agency."  Former

RCW 26.44.020(2) (2000).  Therefore, Vancouver potentially is subject to liability for negligent

investigation under RCW 26.44.050.

However, prosecutors generally have absolute immunity for initiating and pursuing a

criminal prosecution.  *Musso-Escude v. Edwards*, 101 Wn. App. 560, 570, 4 P.3d 151 (2000).

Absolute immunity means that a prosecutor is shielded from liability even when he or she

---

[7] DSHS notes that it was Fearghal who provided the information that caused its "founded" finding to be amended to "inconclusive," and argues that he likely communicated that information to the courts as well.

engages in willful misconduct. *Id.* at 568. This immunity is warranted to protect the prosecutor's role as an advocate because any lesser immunity could impair the judicial process. *Id.* at 573.

But a prosecutor's absolute immunity applies only to those actions within the scope of traditional prosecutorial functions. *Rodriguez*, 99 Wn. App. at 450. A prosecutor is subject to liability under RCW 26.44.050 if he or she "engages in functions outside the scope of prosecutorial duties." *Id.*

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is "neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other."

*Id.* (quoting *Gilliam v. Dept. of Soc. & Health Servs.*, 89 Wn. App. 569, 583, 950 P.2d 20 (1998)).[8]

2.  Petty's Immunity

The question here is whether Fearghal and CPM/CCM have presented sufficient evidence that Petty took investigative actions outside the scope of her duties as a prosecutor to create a genuine issue of material fact. If so, absolute immunity does not apply. But if Petty did not exceed the scope of her duties as a prosecutor, then absolute immunity shields her from the claim.

---

[8] *Gilliam* quotes *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993).

Fearghal and CPM/CCM rely on various allegations by Patricia regarding her interactions with Petty. First, in the lengthy "Stipulation to Findings of Fact" written and signed by Patricia and Fearghal in 2008 for the family court, Patricia alleges that she initially expressed reluctance about pursuing Fearghal's prosecution. Patricia claims that Petty told her that (1) it was not Patricia's decision to drop charges, (2) Fearghal fit the profile of a typical abuser, (3) Patricia fit the profile of the typical domestic violence victim, (4) Petty was outraged by the police report, (5) Patricia should be fearful of Fearghal, (6) Patricia would lose credibility in any divorce action if she recanted, which would likely result in her losing custody, (7) if Patricia recanted, Petty would notify Child Protective Services (CPS) who would take the children from Patricia and put them in foster care, and (8) if Patricia recanted she would be prosecuted for making a false police report. Patricia also alleges that Petty told her to file for divorce and to petition for an order of protection that would remove Fearghal from the home and prohibit his contact with the children.

However, Petty allegedly made each of these statements while conferring with Patricia, a witness, in preparation of her case against Fearghal. Conferring with potential witnesses is within the scope of a prosecutor's traditional duties. *Rodriguez*, 99 Wn. App. at 450. The fact that Petty's conduct allegedly was improper or wrongful is immaterial to the question of whether immunity applies.

Second, Patricia alleges that Petty told her that she needed more charges against Fearghal to strengthen her case and enable her to convict and deport Fearghal. Petty told Patricia to obtain and bring to her fitness club records to show that Fearghal had violated the no-contact order by going to a fitness club when Patricia was there with the children. Then Petty directed Patricia to

report the violation. Fearghal and CPM/CCM argue that this conduct involved case investigation and fact-finding that is outside the prosecutor's function.

Again, these allegations do not indicate that Petty acted outside her scope as a prosecutor. Her actions in asking for the fitness club records and directing Patricia to report no-contact order violations are related to her duty to make charging decisions. The charging function is intimately related to the judicial process and prosecutorial immunity must apply to ensure the independence of the decision-making process. *Hannum v. Friedt*, 88 Wn. App. 881, 886-87, 947 P.2d 760 (1997).

Third, Patricia alleges that Petty strategized with Patricia's dissolution attorney regarding dissolution matters. But Patricia admits that she was not part of any conversations between her dissolution attorney and Petty and that her knowledge of them is based only on her dissolution attorney's hearsay statements to her. And Patricia's dissolution attorney stated in her deposition that she talked to Petty once and asked her if she wanted to cooperate with the divorce, but Petty said no. As a result, there is insufficient evidence to create a genuine issue of material fact regarding whether Petty injected herself into the dissolution proceedings.

Finally, Patricia alleges that during her deposition in September 2009, Petty met with her during breaks in the bathroom to give her instructions on what to say. However, we need not consider whether Petty coaching Patricia during a deposition falls outside the scope of Petty's immunity. Fearghal and CPM/CCM filed their complaint in January 2009, months before these events allegedly occurred. They did not take any action to incorporate these allegations into their complaint. Therefore, they cannot use the events surrounding the September 2009 deposition to support their claim here. Further, Petty left the Vancouver City Attorney's office in early 2006.

As a result, Petty's conduct at the September 2009 deposition was outside her scope of employment with Vancouver and could not subject Vancouver to liability.

Even viewing all of the facts alleged by Fearghal and CPM/CCM in the light most favorable to them, there is no genuine issue of material fact whether Petty stepped outside of her role as prosecutor. Accordingly, we hold that Petty is entitled to absolute prosecutorial immunity and that the trial court did not err in granting summary judgment in favor of Vancouver on this claim.

CONCLUSION

Clark County, DSHS, and Vancouver are not subject to negligent investigation liability under RCW 26.44.050. We consider and reject Fearghal's and CPM/CCM's remaining claims in the unpublished portion of this opinion. Accordingly, we affirm the trial court's grant of summary judgment in favor of Clark County, DSHS, and Vancouver on all claims.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Fearghal and/or CPM/CCM asserted a number of other causes of action against Clark County, DSHS, and/or Vancouver: (1) false arrest/false imprisonment (Clark County), (2) negligent supervision/training/retention of case investigator (DSHS), (3) malicious interference with the parent/child relationship (Vancouver), (4) negligent investigation under RCW 26.44.050 regarding the failure to investigate Fearghal's concerns that Patricia was abusing or neglecting the children (Clark County, DSHS), (5) negligent failure to arrest Patricia (Clark County, Vancouver), (6) gender discrimination (Vancouver), (7) outrage (all defendants),

24

and (8) negligent infliction of emotional distress (all defendants).  We hold that summary judgment was appropriate on all these causes of action.  We also reject the argument that the trial court erred in granting Vancouver's motion to suppress Patricia's deposition correction pages.

ADDITIONAL FACTS

*Fearghal's First Report against Patricia for Violating Restraining Order*

On October 5, 2005, Fearghal reported to Clark County Sheriff's Deputy Todd Young that Patricia had violated the mutual restraining order issued in the dissolution action.  Fearghal said that Patricia had called him three times in one evening to yell at him.  Young confirmed that the restraining order was in place and spoke with Patricia.  Patricia admitted violating the restraining order.  Young did not arrest Patricia, but he referred his report to the prosecuting attorney to consider charges.  No charges were filed against Patricia.

*Fearghal's Second Report against Patricia for Violating Restraining Order*

On January 11, 2006, Fearghal reported to Clark County Sheriff's Deputy Douglas Paulson that Patricia had violated the restraining order by coming to Fearghal's house, opening the front door, and shouting at him.  Paulson and Young investigated and spoke with Patricia in person.  She admitted to going to Fearghal's house and yelling in the doorway.  Paulson did not arrest Patricia, but he referred his report to the prosecuting attorney to decide about filing charges.  No charges were filed against Patricia.

*Fearghal's Report to CPS*

Also in January, Fearghal reported to CPS concerns that Patricia was not properly supervising CPM and CCM based on things CPM told Fearghal.  CPM told Fearghal that a dog bit CCM on the face while he was in the care of Patricia's boyfriend.  CPM also said Patricia

25

allowed him to ride his bike without a helmet along a busy road and that he took baths with the three-year-old daughter of Patricia's boyfriend.

CPS took into account the factors surrounding Fearghal's report, including that he and Patricia were in the middle of a custody dispute, that Fearghal had no-contact orders prohibiting him from seeing CPM and CCM, and that the doctor who treated CCM's dog bites did not make a referral. CPS listed Fearghal's report as information only and did not refer the report for further investigation.

*Fearghal's Report against Patricia for Check Fraud*

On May 5, Fearghal reported to Clark County Sheriff's Deputy Richard Farrell that Patricia had cashed a $5,000 check without his authorization. Farrell contacted Patricia, who said that the check belonged to the business she had started and that her name was on the business license. Farrell told Fearghal that because he was still married to Patricia he considered the check a civil issue that Fearghal should handle through his dissolution proceedings. Farrell did not arrest Patricia, but he did refer the matter to the prosecuting attorney for review. No charges were filed against Patricia.

*Fearghal's Report of Concern for CCM*

On December 13, the commissioner in the dissolution case entered an order granting Fearghal's request for reunification counseling and also allowed for Fearghal to retrieve certain property from Patricia's home. On December 17, pursuant to the court order, Fearghal went to Patricia's home to retrieve some personal items. While there, Fearghal alleged that he was harassed by Patricia's boyfriend and father and feared for his safety. Fearghal called 911 and Farrell responded.

While Fearghal was in the house he saw a chain lock on CCM's bedroom door and became concerned. He told Farrell about the lock and his concerns for CCM's safety. Farrell did not write a report about the incident.

*Patricia's False Abuse Allegation*

On November 18, 2007, Patricia took CCM to the hospital and alleged that Fearghal had hit CCM. Clark County Sheriff's Deputy Erik Zimmerman investigated. According to Fearghal, Zimmerman did not believe Patricia's allegations. Fearghal told Zimmerman that Patricia's false allegation was a violation of the restraining order, but Zimmerman did not arrest Patricia.

*Fearghal's Third Report against Patricia for Violating the Restraining Order*

On November 29, Fearghal took CCM to a medical center for surgery. At that point Fearghal and Patricia had shared custody of CCM, but still had the restraining order and a no-contact order that prohibited contact with each other. Patricia arrived at the surgery center on the day of CCM's surgery and held CCM on her lap. Fearghal called the police to report her for violating the restraining order by showing up unannounced.

Vancouver Police Officer Tyson Taylor responded. He spoke with Patricia, who told him that the family court judge had given her permission to be at the surgery. However, Patricia did not have any paperwork with her indicating that she had permission. Fearghal said that the judge might have given Patricia permission, but he did not remember any final decision and she had not told him that she was coming. Patricia left the surgery center, and Taylor wrote a report about the incident and forwarded it to the DVPC for review. No charges were filed against Patricia.

*Patricia Deposition Corrections*

In July 2010, Vancouver filed a motion to suppress Patricia's multiple corrections of her earlier deposition testimony submitted in opposition to summary judgment. The trial court granted Vancouver's motion, but allowed the corrected pages to be accepted as a declaration of Patricia.

ADDITONAL ANALYSIS

A.   CLARK COUNTY FALSE ARREST/FALSE IMPRISONMENT

Fearghal alleges that questions of fact exist whether Clark County is liable for false arrest and false imprisonment based on Kingrey's arrest of him. We disagree because there is no question of fact that Kingrey had probable cause to arrest Fearghal for fourth degree assault.[9]

1.   Legal Principles

"A false arrest occurs when a person with actual or pretended legal authority to arrest unlawfully restrains or imprisons another person." *Youker v. Douglas County*, 162 Wn. App. 448, 465, 258 P.3d 60 (2011). False imprisonment occurs whenever a false arrest occurs. *Id.*

The existence of probable cause is a complete defense to false arrest and false imprisonment. *McBride v. Walla Walla County*, 95 Wn. App. 33, 38, 975 P.2d 1029, 990 P.2d 967 (1999). "Probable cause requires a showing that 'the facts and circumstances within the arresting officer's knowledge and of which the officer has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in a belief that an offense has been

---

[9] Clark County argues that Fearghal's false arrest and imprisonment claims must be dismissed because he filed his complaint after the applicable statute of limitations expired. However, Clark County did not raise this argument in the trial court summary judgment proceedings. Therefore, we decline to address it.

committed.' " *State v. Barron*, 170 Wn. App. 742, 750, 285 P.3d 231 (2012) (quoting *State v. Terrovona*, 105 Wn.2d 632, 643, 716 P.2d 295 (1986)). "Probable cause can arise from the report of a crime victim or witness, at least in the absence of circumstances tending to show the report is unreliable." *State v. King*, 89 Wn. App. 612, 624, 949 P.2d 856 (1998).

Whether probable cause exists depends on the totality of the circumstances within the officer's knowledge at the time of arrest. *Barron*, 170 Wn. App. at 750. The test is reasonableness, "considering the time, place, and circumstances, and the officer's special expertise in identifying criminal behavior." *McBride*, 95 Wn. App. at 38.

Kingrey arrested Fearghal for fourth degree assault, a misdemeanor. RCW 10.99.030(6)(a) states that "[w]hen a peace officer responds to a domestic violence call and has probable cause to believe that a crime has been committed, the peace officer shall exercise arrest powers with reference to the criteria in RCW 10.31.100." RCW 10.31.100 generally states that a police officer may arrest a person without a warrant for committing a misdemeanor only when the offense is committed in the officer's presence. However, an exception exists when the officer has probable cause to believe that a person has committed a misdemeanor involving physical harm. RCW 10.31.100(1). Therefore, Kingrey had statutory authority and a statutory duty to arrest Fearghal if he had probable cause to believe that Fearghal had physically injured Patricia and/or CCM.

2. Kingrey's Probable Cause to Arrest

The parties do not dispute the facts related to Kingrey's investigation and arrest. Kingrey spoke with Patricia on the phone after she made her initial 911 call. Patricia told Kingrey that Fearghal had been mentally and physically abusing her, and as recently as a week prior he

physically assaulted her by pushing, shoving, and grabbing her neck and arms. She also told Kingrey that the prior evening Fearghal had struck CCM on the head, causing CCM to hit his head on the table and fall off his chair. In addition, Kingrey spoke with Patricia's mother, who told him that CPM had told her that Fearghal hit both Patricia and CCM.

Fearghal argues that the prosecutor later dropped the assault charge regarding Patricia, which indicates there was no probable cause. However, even if Fearghal's arguments about the arrest for Patricia's assault are accepted, the absence of probable cause to believe a person committed one crime for which he was arrested does not invalidate the arrest if police had sufficient information at the time of arrest to support the arrest on a different charge. *Gurno v. Town of LaConner*, 65 Wn. App. 218, 223, 828 P.2d 49 (1992). Therefore, even assuming there was no probable cause to arrest Fearghal for assault against Patricia, the arrest still could be valid if there was probable cause for arrest for the assault against CCM.

Patricia's and her mother's statements provided Kingrey with strong evidence that Fearghal assaulted CCM. Patricia was an eyewitness and provided specific details about the incident. Greer provided a hearsay statement from CPM that confirmed what had happened. Based on this information, there is no question that Kingrey had reasonable grounds to believe that Fearghal had struck CCM the prior evening.

Fearghal argues that Kingrey lacked probable cause because Kingrey (1) did not speak with Patricia in person, (2) did not interview CPM, (3) did not have any evidence of injury, and (4) ignored Fearghal's statements about Patricia's drug use, delusions, and mental health issues. The first two facts may raise questions about the depth of Kingrey's investigation and the third fact may provide some level of uncertainty, but they cannot negate probable cause in the face of

a detailed, eyewitness account of the crime. And none of these facts involve exculpatory evidence.

The fourth fact relates to the trustworthiness of Patricia's report, which is a factor in the probable cause analysis. But again, Patricia was an eyewitness to the alleged assault, and an officer is entitled to believe her story even though there may be questions about her account. Some uncertainty regarding the credibility of an eyewitness does not negate probable cause.

The evidence shows that Kingrey had enough information to warrant a belief that Fearghal had assaulted CCM. Therefore, there is no genuine issue of material fact that Kingrey had probable cause to arrest Fearghal for fourth degree assault against CCM. Because probable cause is a complete defense to false arrest and false imprisonment, we hold that the trial court did not err in granting summary judgment in favor of Clark County on Fearghal's false arrest and false imprisonment claims.

B. DSHS SUPERVISION/TRAINING/RETENTION

Fearghal alleges that questions of fact exist whether DSHS is liable for the supervision, training, and retention of Dixson on both negligence and wanton misconduct theories. We disagree.

Negligent supervision creates a limited duty to control an employee for the protection of third persons, even when the employee is acting outside the scope of employment. *Niece v. Elmview Grp. Home*, 131 Wn.2d 39, 51, 929 P.2d 420 (1997). "If an employee conducts negligent acts outside the scope of employment, the employer may be liable for negligent supervision." *Rodriguez*, 99 Wn. App. at 451. In addition, an employer may be liable to a third

person for negligence in retaining an employee who is incompetent or unfit. *Peck v. Siau*, 65 Wn. App. 285, 288, 827 P.2d 1108 (1992).

However, here there is no allegation that Dixson acted outside the scope of his employment, so the negligent supervision claim is inapplicable. *LaPlant v. Snohomish County*, 162 Wn. App. 476, 479-80, 271 P.3d 274 (2011). In addition, a claim for negligent supervision, training and retention requires some injury to the third person caused by the negligent or wrongful actions of the employee. *Peck*, 65 Wn. App. at 288. As discussed above, we hold that Dixson's investigation was not the proximate cause of any harmful placement decision.[10]

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of DSHS on Fearghal's claims for negligent training, supervision, and retention of Dixson.

C.     VANCOUVER MALICIOUS INTERFERENCE

Fearghal alleges that questions of fact exist whether Vancouver is liable for malicious interference with the parent-child relationship based on Petty's conduct toward him. We hold that even though a genuine issue of material fact exists regarding Petty's liability for malicious interference, she has absolute immunity for this claim.

The elements of a claim for malicious interference with a parent-child relationship are (1) the existence of a family relationship, (2) a wrongful interference with the relationship by a third person, (3) an intention on the part of the third person that such wrongful interference results in a

---

[10] Fearghal also alleges wanton misconduct. However, wanton misconduct technically is not a separate cause of action, but a level of intent that negates certain defenses which might be available in an ordinary negligence action. *Rodriguez v. City of Moses Lake*, 158 Wn. App. 724, 730-31, 243 P.3d 552 (2010). Willful and wanton behavior is linked to specific standards of duty. *Id.* at 732. Therefore, to the extent that Fearghal argues DSHS intentionally acted with reckless disregard, that is part of the larger negligence claim, not a stand-alone cause of action.

loss of affection or family association, (4) a causal connection between the third party's conduct and the loss of affection, and (5) that such conduct resulted in damages. *Waller v. State*, 64 Wn. App. 318, 338, 824 P.2d 1225 (1992).

Fearghal asserts that Petty intentionally pressured Patricia to take actions that would separate Fearghal from the family, including petitioning for dissolution and a protective order. According to Patricia, the case "got personal" for Petty, CP at 524, and "the concept of Fearghal not getting a conviction was intolerable" to Petty, CP at 755. Patricia did petition for dissolution and a protective order, which caused further separation between Fearghal and the family. Arguably, Fearghal has presented evidence to support every element of a claim for malicious interference.

However, as discussed above Petty is entitled to absolute immunity for her interactions with Patricia because they were within the scope of her function as a prosecutor. Therefore, Petty's absolute immunity protects her from this claim. *Musso-Escude*, 101 Wn. App. at 568. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Vancouver on this claim.

D.    FAILURE TO INVESTIGATE FEARGHAL'S CONCERNS

Fearghal argues that Clark County and DSHS are liable for negligent investigation under RCW 26.44.050 because they failed to investigate his reported concerns for the safety of CPM and CCM while in Patricia's care. We disagree.

1.    Clark County Liability

Fearghal argues that Paulson, Young, and Farrell conducted negligent investigations by failing to investigate his concerns for his children's safety, which led to the children remaining in

Patricia's abusive home. We hold that (1) Fearghal's expression of concern on January 11, 2006 regarding Patricia's mental state did not constitute a report concerning possible abuse or neglect triggering a duty to investigate, and (2) there is insufficient evidence to create a genuine issue of fact that Farrell's failure to investigate Fearghal's report on December 17, 2006 that there was a chain lock on CCM's bedroom door was a proximate cause of CCM remaining in Patricia's home.

RCW 26.44.050 states that a law enforcement agency must investigate "a report concerning the possible occurrence of abuse or neglect." Fearghal claims that he made two "reports" that he feared for the safety of his children.

First, on January 11, 2006, Fearghal called 911 and reported that Patricia had come to his home and yelled at him in violation of the mutual restraining order. According to the incident report, Fearghal later called back "to report that he was in fear [for] the safety of his two children. He claimed that Patricia was distraught and we needed to check on the kids." CP at 1681. Under these facts, Fearghal did not make a report concerning possible abuse or neglect of CPM and CCM. His concern for his children's safety was because Patricia was distraught, not because she was abusing or neglecting them. Further, Fearghal only mentioned his concern once over the telephone and did not express any concern to the investigating officers. We hold as a matter of law that Fearghal's expression of concern to the 911 operator about Patricia being distraught did not trigger a duty to investigate under RCW 26.44.050.

Second, on December 17, 2006, pursuant to a court order, Fearghal went to Patricia's home to retrieve some personal items. While there, Fearghal was harassed by Patricia's boyfriend and father and several other men. Fearghal called the police and Farrell responded.

While Fearghal was in the house, he saw a chain lock on CCM's bedroom door. He stated that "I advised Deputy Farrell of my concern about my child's safety and showed him the chain lock." CP at 1795. Farrell did not respond to this concern and did not write a report about the incident.

The fact that a young child has a chain lock on his bedroom door could constitute evidence of abuse or neglect, depending on the circumstances. Therefore, whether Fearghal's statement to Farrell amounted to a "report concerning the possible occurrence of abuse or neglect" presents a genuine issue of material fact. And if Fearghal's statements did amount to a report that created a duty to investigate, the fact that Farrell did not investigate at all establishes that there is a question of fact as to whether he breached that duty.

However, in order to avoid summary judgment Fearghal was required to come forward with some evidence that any negligence was a proximate cause of CCM remaining in Patricia's home. In other words, Fearghal was required to create a genuine issue of fact that but for Farrell's failure to investigate, CCM would have been removed from the home. However, Fearghal produced no such evidence. Nothing in the record shows what Farrell would have discovered if he had conducted additional investigation. Patricia may have had an innocent explanation for having the chain lock on CCM's door. And nothing in the record shows that CCM would have been removed from Patricia's home even if the investigation raised some questions about the propriety of placing the lock on CCM's door.

Because there was no evidence supporting a finding of proximate cause, Clark County was entitled to summary judgment on this claim. Accordingly, we hold that the trial court did

35

not err in granting summary judgment in favor of Clark County for Fearghal's negligent investigation claims related to Paulson, Young, and Farrell.

    2.    DSHS Liability

Fearghal argues that DSHS was negligent for failing to investigate the report he made to CPS on January 8, 2006 of Patricia's neglect, which led to CPM and CCM remaining in an abusive home. We hold that there was insufficient evidence to create a genuine issue of fact that DSHS's failure to investigate Fearghal's report was a proximate cause of CCM remaining in Patricia's home.

Under WAC 388-15-017(3), "CPS must assess or investigate all reports of alleged child abuse or neglect that meet the definitions of child abuse or neglect." Here, Fearghal reported that CPM had told him that CCM was bitten on the face by a dog while the care of Patricia's boyfriend. CPM also told Fearghal that he was allowed to ride his bike without a helmet along a busy road and that he took baths with the three-year-old daughter of Patricia's boyfriend. CPS designated the report as "information only" and did not order an investigation or family assessment.

Even if there is a question of fact regarding DSHS's negligence in failing to investigate, once again Fearghal was required to come forward with some evidence of proximate cause – that but for DSHS's failure to investigate, CPM and CCM would have been removed from the home. However, Fearghal produced no such evidence. Nothing in the record shows what DSHS would have discovered if it had conducted more investigation. Because CPM's statements to Fearghal were hearsay, there was no admissible evidence that Fearghal's allegations were even true. And

there is no evidence that a DSHS investigation would have revealed information that would have caused the children to be removed from Patricia's home.

Because there was no evidence supporting a finding of proximate cause, DSHS was entitled to summary judgment on this claim. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of DSHS for Fearghal's negligent investigation claims related to his report of neglect to CPS.

E.      NEGLIGENT FAILURE TO ARREST

Fearghal alleges that questions of fact exist whether Clark County and Vancouver are liable for negligence based on the failure of Young, Paulson, Farrell, and Zimmerman (Clark County) and Taylor (Vancouver) to arrest Patricia for her protective order violations. We disagree.

1.      Legal Principles

RCW 10.99.030(6)(a) states that "[w]hen a peace officer responds to a domestic violence call and has probable cause to believe that a crime has been committed, the peace officer shall exercise arrest powers with reference to the criteria in RCW 10.31.100." RCW 10.31.100 generally states that a police officer may arrest a person without a warrant for committing a misdemeanor only when the offense is committed in the officer's presence.

However, RCW 10.31.100(2) provides a list of situations when "[a] police officer shall arrest and take into custody . . . a person without a warrant." One such situation is if there is probable cause that a person has knowledge of a restraining order issued under RCW 26.09 and the person has violated the terms of the order restraining the person by (1) acts or threats of violence, or (2) going onto the grounds of or entering a residence, workplace, school, or day

care, or (3) knowingly coming within, or knowingly remaining within, a specified distance of a specified location. RCW 10.31.100(2)(a).

Generally, when an officer has legal grounds to make an arrest he has considerable discretion to do so. *Donaldson v. City of Seattle*, 65 Wn. App. 661, 670, 831 P.2d 1098 (1992). The rule is different with regard to domestic violence. If the officer has legal grounds to arrest pursuant to RCW 10.31.100(2)(a), he or she has a mandatory duty to make the arrest. *Id.*

2. Clark County Liability

Fearghal claims Clark County breached statutory duties owed to him because Young, Paulson, Farrell, and Zimmerman failed to enforce the dissolution restraining order when Fearghal made reports of Patricia's violations. We hold that there is evidence that Paulson and Young breached the duty to arrest Patricia for the January 11, 2006 incident, but that there is no evidence that the failure to arrest caused any damages. We also hold that the officers had no duty to arrest for the other incidents Fearghal references.[11]

On August 31, 2005, the trial court in the dissolution case issued a restraining order pursuant to RCW 26.09.060. The mutual restraining order restrained and enjoined Fearghal and Patricia from "assaulting, harassing, molesting or disturbing the peace of the other party or of any child" and from "going onto the grounds of or entering the home of the other party." CP at 1264. Because the restraining order was an order issued under RCW 26.09, the mandatory arrest provision of RCW 10.31.100(2)(a) applied.

---

[11] Clark County also argues that RCW 10.99.070 provides Young, Paulson, Farrell, and Zimmerman with statutory immunity. Because we find no liability, we do not address this immunity argument.

Fearghal's failure to arrest claim against Clark County involves five incidents: (1) Young's investigation when Patricia called Fearghal three times in one evening to yell at him on October 5, 2005, (2) Paulson's and Young's investigation when Patricia came to Fearghal's residence, opened the front door, and shouted at him on January 11, 2006; (3) Farrell's investigation of Fearghal's report that Patricia forged his signature to cash a $5,000 check on May 5, 2006, (4) Farrell's investigation when Patricia's father and boyfriend harassed Fearghal when he was at her residence pursuant to a court order on December 17, 2006, and (5) Zimmerman's investigation when Patricia made a false allegation of abuse against Fearghal on November 11, 2007.

Although incidents (1), (3), (4) and (5) could amount to violations of the restraining order's provision restraining the parties from "harassing, molesting, or disturbing the peace of the other party," they did not meet the mandatory arrest criteria under RCW 10.31.100(2)(a). Because none of these incidents involved acts or threats of violence or going onto restricted grounds or remaining in a prohibited area, Young, Farrell, and Zimmerman were under no statutory duty to arrest Patricia.

The January 11, 2006 incident, which involved Patricia violating the restraining order by going onto the grounds of Fearghal's residence, did meet the requirements for mandatory arrest under RCW 10.31.100(2)(a). During their investigation, Paulson and Young spoke with Patricia in person. She admitted to going to Fearghal's house and yelling in the doorway. But Paulson and Young did not arrest Patricia. Therefore, Fearghal produced evidence that Paulson and Young breached their duty under RCW 10.31.100(2)(a) by failing to arrest Patricia in January 2006.

However, Fearghal presents no evidence that this failure to arrest Patricia caused him any damages. Nothing in the record shows that the children would have been removed from Patricia's home if she had been arrested. Fearghal does not even allege that this failure to arrest harmed him in any way.

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Clark County on this claim.

3.    Vancouver Liability

On November 29, 2007, Fearghal called the police to report Patricia for violating the restraining order by showing up unannounced to CCM's surgery. Taylor responded, but he did not arrest Patricia.

Although Patricia may have violated the restraining order, she did not commit any acts or threats of violence or go onto the grounds or enter the home of Fearghal. And there was no provision in the restraining order that restrained her from coming within any specified distance of Fearghal. Therefore, as a matter of law Patricia's actions did not constitute a violation requiring mandatory arrest under RCW 10.31.100(2)(a).

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Vancouver on this claim.[12]

---

[12] Fearghal also argues that Vancouver is liable for failing to charge Patricia with restraining order violations. However, as discussed above, Vancouver has prosecutorial immunity regarding charging decisions. Therefore, we reject this claim.

F.    VANCOUVER DISCRIMINATION

Fearghal alleges that questions of fact exist whether Vancouver is liable for violation of the Washington Law Against Discrimination (WLAD) based on Petty's conduct toward him and Taylor's failure to arrest Patricia at the hospital. We disagree.

The WLAD establishes the right to be free from discrimination because of sex, and provides a right of action against anyone deeming himself injured by an act in violation of chapter 49.60 RCW. RCW 49.60.030(1), (2). However, the WLAD does not interfere with common law immunities. *See Kelley v. Pierce County*, 179 Wn. App. 566, 574-77, 319 P.3d 74 (2014) (considering whether guardian ad litem was acting within his duties and acknowledging that if he was, he would be entitled to claim quasi-judicial immunity to shield him from WLAD claim for sexual harassment and gender discrimination).

First, Fearghal's claim against Petty is based on actions she took while executing her duties as prosecutor. Fearghal argues that Petty's motives in charging him and prosecuting him were gender based and discriminatory, but he fails to show any reason why Petty's absolute prosecutorial immunity would not apply. As explained above, prosecutors enjoy absolute immunity for actions they take in initiating and pursuing a criminal prosecution, even when willful misconduct is alleged. *Musso-Escude*, 101 Wn. App. at 568.

Second, Fearghal claims that Taylor failed to execute his statutory duties to protect Fearghal based on gender bias. However, as discussed above, Taylor had no duty to arrest Patricia for her violation of the restraining order because the violation was not of any type described in RCW 10.31.100(2)(a). Therefore, Fearghal's claim fails to establish all the necessary elements.

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Vancouver on Fearghal's WLAD claims.

G.   OUTRAGE

Fearghal and CPM/CCM allege that questions of fact exist whether Clark County, DSHS, and Vancouver are liable for the tort of outrage.  We disagree.

1.   Legal Principles

A claim for outrage (also known as intentional infliction of emotional distress) requires proof of three elements:  (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to the plaintiff of severe emotional distress. *Trujillo v. NW Tr. Servs., Inc.*, 183 Wn.2d 820, 840, 355 P.3d 1100 (2015).

To establish extreme and outrageous conduct, a plaintiff must show that the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  *Id.* The question of whether the conduct is sufficiently outrageous is ordinarily for the jury, but the court makes an initial determination whether reasonable minds could differ about whether the conduct was sufficiently extreme to result in liability.  *Id.*

We may consider a number of factors in determining whether conduct is sufficient to support an outrage claim, including (1) the position the defendant occupied, (2) whether the plaintiff was particularly susceptible to emotional distress and the defendant was aware of the susceptibility, (3) whether the defendant's conduct was privileged, (4) whether the degree of emotional distress was severe as opposed to merely annoying, inconvenient, or embarrassing, and (5) whether the defendant was aware of a high probability that his or her conduct would

cause severe emotional distress and consciously disregarded that probability. *Sutton v. Tacoma School Dist. No. 10*, 180 Wn. App. 859, 870, 324 P.3d 763 (2014).

2.    Clark County Liability

Clark County argues that summary judgment was appropriate because Fearghal's and CPM/CCM's claim for outrage fails to establish any extreme or outrageous conduct on the part of Kingrey, Paulson, Young, or Farrell.  We agree.

Fearghal and CPM/CCM argue that Kingrey's conduct was outrageous because "in a civilized society, no one expects law enforcement to make arrests solely to separate a father from a child."  However, Kingrey's arrest of Fearghal was not outrageous or extreme.  As discussed above, Kingrey's arrest was based on Patricia's eyewitness account of Fearghal striking CCM, which was corroborated by Patricia's mother.  Even if Kingrey had no probable cause to arrest Fearghal,  reasonable minds could not differ that Kingrey's conduct was not beyond the bounds of decency or intolerable in a civilized community.

Fearghal and CPM/CCM argue that Paulson, Young, and Farrell acted outrageously because they failed to arrest Patricia for her admitted violations of the temporary mutual restraining order.  However, even though we hold that there is evidence that Paulson and Young breached their duty to arrest Patricia on one occasion, reasonable minds could not differ that Young, Paulson, and Farrell did not act beyond the bounds of decency or in a way intolerable to civilized society.

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Clark County on Fearghal's outrage claims against Kingrey, Paulson, Young, and Farrell.

3. DSHS Liability

Fearghal alleges that DSHS is liable for outrage based on Dixson's fabrication of reports and DSHS's retention of Dixson despite knowing that he was fabricating reports. However, Fearghal's attorney wrote a letter to DSHS that stated "[b]y this letter, we can deem plaintiffs' Complaint amended by interlineations to strike the following claims against the State . . . Intentional infliction of emotional distress." CP at 1434. DSHS never moved for summary judgment on outrage and the trial accordingly never heard argument or ruled on the claim. CPM and CCM agree that the outrage claim was abandoned at trial.

Because Fearghal represented to DSHS that he intended to strike his outrage claim against DSHS, we hold that the argument was abandoned and the appeal on this issue fails.

4. Vancouver Liability

Fearghal argues that his outrage claim against Vancouver should withstand summary judgment because reasonable minds could differ about whether Petty and Taylor acted with sufficient intent and recklessness. We disagree.[13]

Fearghal's outrage claim based on Petty's conduct fails because Petty's actions are covered by absolute prosecutorial immunity, as explained above. Even if Petty's conduct was outrageous, she was acting in her role as prosecutor in initiating and developing charges and therefore has absolute immunity.

Fearghal claims that Taylor's conduct was outrageous because no person in civilized society expects an officer to ignore admitted violations of a restraining order. But Taylor

---

[13] Vancouver argues that Fearghal abandoned his claim for outrage by failing to argue it during summary judgment below. Based on the record below, we disagree that Fearghal abandoned this claim.

investigated the incident, interviewing both Patricia and Fearghal. He made a police report and forwarded his report to the DVPC. In addition, as explained above, Taylor was not under a mandatory duty to arrest Patricia for her violation. Therefore, reasonable minds could not differ that Taylor did not act beyond the bounds of decency or in a way intolerable to civilized society.

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Vancouver on the outrage claims.

H.      NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Fearghal alleges that questions of fact exist whether Clark County, DSHS, and Vancouver are liable for negligent infliction of emotional distress based on their alleged negligent investigation and negligence. We disagree.

A successful claim for negligent infliction of emotional distress requires proof of negligence (duty, breach of the standard of care, proximate cause, and damage) and objective symptomatology. *Strong v. Terrell*, 147 Wn. App 376, 387, 195 P.3d 977 (2008).

Objective symptomology requires emotional distress that is susceptible to medical diagnosis and proved through medical evidence. *Haubry v. Snow*, 106 Wn. App. 666, 678-79, 31 P.3d 1186 (2001). Nightmares, sleep disorders, intrusive memories, fear, and anger may be sufficient, but they must constitute a diagnosable emotional disorder. *Id.* at 679. There must be objective evidence regarding the severity of the distress and the causal link between the actions complained of and the emotional reactions. *Id.*

Fearghal alleges that he suffered greatly from feelings of fear, anxiety, and depression, which made functioning normally difficult for him. However, the only allegation that potentially

involves an objective manifestation of emotional distress is his statement that "[o]ftentimes, I had nightmares." CP at 1792.

Fearghal has insufficient medical evidence to support his claim. He relies on a declaration from Dr. James Boehnlein that Fearghal displayed elements of multiple diagnosable mental health conditions and Fearghal's testimony showed strong indicators that he may have significant depression or anxiety. However, Dr. Boehnlein never saw Fearghal – he made these statements after reviewing Fearghal's declaration. And Dr. Boehnlein's declaration also notes that "any reliable diagnoses cannot be made without further history and direct interviews." CP at 1787. Without a diagnosis based on objective symptoms and evidence of causation, Fearghal fails to meet the objective symptomology requirement to support a negligent infliction of emotional distress claim.

Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Clark County, DSHS, and Vancouver on the negligent infliction of emotional distress claim.

I.      HANDLING OF DEPOSITION CORRECTIONS

Fearghal and CPM/CCM argue that the trial court erred in granting Vancouver's motion to suppress Patricia's correction pages regarding her deposition testimony.[14] We decline to address this issue because the trial court accepted Patricia's correction pages as her declaration, and those correction pages were part of the summary judgment record.

---

[14] Fearghal assigned error to the trial court's ruling. CPM/CCM did not assign error to this ruling, but did address the issue in their brief.

CR 30(e) provides that a deposition witness can make changes in form or substance to his or her testimony before signing the deposition. However, the rule also provides that if the witness does not sign the deposition within 30 days after it is submitted to the witness, the deposition may be used as fully as though signed. CR 30(e).

Here, Patricia's deposition was taken over five sessions between September 2009 and March 2010. At some point, Patricia prepared 17 pages of corrections that made 244 separate changes to her testimony. She claimed that many of the changes were necessary to correct answers that were given after coaching from Petty and Miles. The parties submitted conflicting evidence regarding when the court reporter submitted the transcript of Patricia's deposition to her and whether Patricia provided the correction pages to the court reporter within 30 days of that date.

The trial court granted Vancouver's motion to suppress the correction pages, finding that those correction pages were not submitted in compliance with CR 30(e). However, the trial court order stated: "The 'correction pages' are accepted as a declaration of Patricia McCarthy." CP at 1098. And the trial court listed the declaration of Megan Holley, which attached Patricia's corrections, as a pleading considered in granting summary judgment to Vancouver on outstanding claims.

Fearghal and CPM/CCM argue that the trial court erred because it suppressed Patricia's correction pages without considering the three *Burnet*[15] factors as required in *Keck v. Collins*, 184 Wn.2d 358, 368, 357 P.3d 1080 (2015). In *Keck*, the Supreme Court held that a trial court

---

[15] *Burnet v. Spokane Ambulance*, 131 Wn.2d 484, 495-96, 933 P.2d 1036 (1997).

must consider the *Burnet* factors before excluding untimely disclosed summary judgment evidence. *Id*. However, here the trial court did not exclude Patricia's correction pages; it expressly stated that it was accepting the correction pages as Patricia's declaration. Therefore, even if *Keck* did apply to deposition corrections that were untimely under CR 30(e), that case would not apply here.

Fearghal and CPM/CCM also argue that even though the trial court accepted the correction pages as Patricia's deposition, the trial court's refusal to enter the pages as a deposition correction pursuant to CR 30(e) was prejudicial because it allowed the defendants to rely on Patricia's uncorrected testimony as substantive evidence. However, in the summary judgment context a trial court must view all evidence in a light most favorable to the nonmoving party. When a witness submits a declaration contradicting earlier deposition testimony and provides an explanation for that contradiction, the declaration can raise a genuine issue of material fact that precludes summary judgment. *See State Farm Mutual Auto. Ins. Co. v. Treciak*, 117 Wn. App. 402, 408-11, 71 P.3d 703 (2003). Therefore, the trial court's ruling does not affect consideration of the summary judgment motions at issue in this appeal.

In addition, at trial whether Patricia's corrections actually change her deposition testimony or are a separate explanation of that testimony would be immaterial. Both the original, uncorrected deposition testimony and the corrected deposition testimony could be used at trial, either as substantive evidence (if admissible) or for impeachment. *See Seattle-First Nat'l Bank v. Rankin*, 59 Wn.2d 288, 293-94, 367 P.2d 835 (1962). If Patricia testified, the defendants would be able to use her uncorrected deposition testimony for impeachment purposes regardless of whether she made her corrections in a timely manner under CR 30(e). And Patricia would be

able to explain why she believes her original deposition testimony was incorrect regardless of whether she complied with CR 30(e) in making her corrections.

We hold that we need not resolve whether the trial court properly suppressed Patricia's correction pages.

J.    COSTS AND ATTORNEY FEES

1.    Trial Court Costs

Fearghal argues that the trial court erred in awarding Vancouver $827.05 in costs for the expense of deposition transcripts, because Vancouver did not rely on factual arguments from the depositions in successfully arguing that prosecutorial immunity entitled the city to summary judgment as a matter of law.  We hold that the trial court did not err in awarding the expense of deposition transcripts to Vancouver.

2.    Frivolous Appeal

Vancouver seeks attorney fees under RAP 18.9(a), arguing that Fearghal's and CPM/CCM's appeals are frivolous.  An appeal is frivolous if there are no debatable issues over which reasonable minds could differ, and there is so little merit that the chance of reversal is slim.  *West v. Thurston County*, 169 Wn. App. 862, 868, 282 P.3d 1150 (2012).

Vancouver argues that the appeals brought by Fearghal and CPM/CCM are frivolous because the law of prosecutorial immunity is well settled.  However, Fearghal and CPM/CCM raised legitimate questions regarding whether Petty was acting within her prosecutorial function. We hold that Fearghal's and CPM/CCM's appeals against Vancouver are not frivolous.

3.   Costs on Appeal

Fearghal and CPM/CCM seek costs and statutory attorney fees under RCW 4.84.030 and 4.84.080.  Because Fearghal and CPM/CCM are not prevailing parties, they are not entitled to costs on appeal.

DSHS seeks costs on appeal under RAP 18.1 and RCW 4.84.060.  Because DSHS is a prevailing party, it is entitled to recover costs on appeal along with Clark County and Vancouver.

CONCLUSION

We affirm the trial court's grant of summary judgment in favor of Clark County, DSHS, and Vancouver on all claims asserted by Fearghal, CPM, and CCM.

_____
MAXA, J.

We concur:

_____
WORSWICK, J.

_____
JOHANSON, C.J.